**SEABOARD LUMBER CO.,**
et al., Plaintiffs,

v.

**UNITED STATES, Defendant.**

Nos. 95–85C, 370–88C, 464–88C, 610–84C, 750–87C.

United States Court of Federal Claims.

July 7, 1998.

---

William F. Lenihan, Seattle, Washington, with Andrew A. Gala, Seattle, Washington, for plaintiffs.

For Nos. 610–84C and 370–88C, Charles F. Beall, Washington, D.C.; for No. 750–87C, Gerald M. Alexander, Washington, D.C.; for No. 464–88C, Lisa B. Donis, Washington, D.C.; for No. 95–85, Richard P. Nockett, Washington, D.C., with whom were Thomas W. Petersen, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, and Frank W. Hunger, Assistant Attorney General, Civil Division, U.S. Department of Justice for defendant. Laurie Ristino, Department of Agriculture, Office of General Counsel, of counsel.

## OPINION

SMITH, Chief Judge.

These cases, *Capital Development Company v. the United States*, No. 750–87C; *Cascade Resources v. the United States*, No. 464–88C; *Merrill and Ring, Inc. v. the United States*, No. 95–85C; *Seaboard Lumber Company v. the United States*, No. 610–84C; and *Seaboard Lumber Company v. the United States*, No. 370–88C; come before the Court on cross-motions for summary judgment after a long history of interlocutory appeal and stays pending the outcome of other litigation. At issue is whether plaintiffs' breaches of various federal timber contracts are legally excusable. Defendant has filed counterclaims in all of these cases seeking the total amount due from plaintiffs because of their contract breaches, as calculated in accordance with certain damage calculation provisions included in the contracts. These cases were selected from a group of consolidated cases. They share certain basic fact patterns and their pleas for summary judgment are based on many of the same grounds and may thus be addressed appropriately in the same opinion.

The plaintiffs, in their complaints, are not seeking a money judgment. Instead, they seek to overturn the contracting officers' decisions that they owe monetary damages due to breach of various contracts. This court has jurisdiction over the parties' claims under 28 U.S.C. § 1491 and 41 U.S.C.

§ 609(a)(1). *See also Engle Investors v. United States*, 21 Cl.Ct. 543, 544 & n. 1 (1989) (timber contractor did not seek money judgment but sought to overturn contracting officer's finding that contractor owed government).

Summary judgment is appropriate when there are no genuine disputes as to any material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When there are no such disputes, a court may grant judgment purely on legal grounds, without an evidentiary hearing or trial. A dispute over a "material fact" is one that "might affect the outcome of the suit under the governing law," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. With regard to a summary judgment motion, "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." *Sweats Fashions, Inc. v. Pannill Knitting Company*, 833 F.2d 1560, 1563 (Fed.Cir.1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). As the Federal Circuit has emphasized, "the burden on the moving party may be discharged by a showing ... that there is an absence of evidence to support the non-moving party's case." *Id.* (quoting *Celotex*, 106 S.Ct. at 2554). In all of the cases at bar, there are at least some genuine disputes as to material facts; none of the parties' motions for summary judgment may be granted in full. However, certain arguments made by each party properly may be disposed of at this time as a matter of law.

The undisputed facts demand the conclusion that none of the plaintiffs' breaches are excused due to the contract doctrines of impossibility of performance, commercial impracticability, or frustration of purpose. Nor were the circumstances such that the "force majeure" clause found in the contracts would excuse non-performance. Nor was the "Olo Too" contract unenforceable due to superven-

ing illegality, as plaintiff Cascade Resources argues. Finally, the damage calculation provisions contained in the various contracts are not invalid as punitive liquidated damages provisions. This court on many occasions has held identically worded or similar damage clauses in timber contracts to be appropriate and enforceable, at least as the proper starting point from which to begin damage calculations.

Defendant claims that it cannot be denied recovery because changes in the resale contracts were mandated by federal law. This claim fails as well. Here, the government required that all new federal timber contracts provide for cash down payments and mid payments. Under the sovereign acts doctrine, invoked by defendant, the government as contractor cannot be held responsible for acts of general application taken by the government as sovereign for the public good. This doctrine is designed to protect the government as contractor by putting it in the same position as a private contractor, when the government acts in its sovereign capacity. The doctrine is intended, however, to be used as a defense. It is not intended to be used as a weapon to extract more damages from a breacher than those for which it would otherwise be liable.

But whether some, if not all, of the contracts at issue were materially changed when they were resold, and the government therefore is barred from recovering damages from plaintiffs under the *Axman* [1] line of cases, depends on facts that remain in dispute. Also, even if the contracts were not so substantially changed that the government is precluded from collecting any damages, it may be appropriate to reduce damages due to changes in the resale contract. A trial is required to determine whether such reductions should be made, and to what degree.

## HISTORICAL BACKGROUND

All of the cases at bar involve contracts for the harvesting of timber on federally owned land entered into between the plaintiffs and the United States Forest Service. Shortly after the contracts were made, lumber prices

---

1. *United States v. Axman*, 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198 (1914) (government resold dredging contract on terms it had denied to original contractor).

dropped precipitously. Due to this price crash, the plaintiffs in each case failed to harvest the timber their contracts required them to harvest. The prices bid for each contract had been high because the bidders had anticipated a continuation of the high inflation that the U.S. had experienced throughout the 1970's. However, at least in part due to changes in federal monetary policy, the inflation rate fell drastically and record high interest rates led to the collapse of the housing market—and the slump in the housing market in turn led to a dramatically decreased demand for lumber.

In the five cases before the court, the Forest Service refused to either rescind or extend the length of the plaintiffs' various timber contracts and instead terminated the contracts due to plaintiffs' failure to perform. The Forest Service then resold or attempted to resell the contracts to various third parties under terms which differed to varying degrees from those of the original contracts, and for a price which in each case was lower than the price bid for the original contract. The Forest Service then requested contract damages from plaintiffs due to the lower resale prices. In response, plaintiffs filed the present actions which have resulted in five cross motions for summary judgment.

This opinion will address in turn the arguments made by plaintiff and defendant in each case. Some of the same arguments are made in several cases.

### DISCUSSION

#### Capital Development

*Capital Development* involves six different timber contracts, nicknamed the "Bride", "Pearl", "Ram", "Cougar", "Short Flat" and "Cow" contracts, entered into by Capital Development ("Capital") and the Forest Service. All six of the contracts were offered for resale, but there were no bidders on the "Cougar" and "Short Flat" contracts. In five of the six contracts, Capital admits breach but moves for summary judgment on the

grounds laid out infra. In the sixth contract, the so-called "Cow" contract, Capital asserts that defendant was actually the breaching party because the Forest Service refused to grant an additional one year extension of Capital's period of performance, as plaintiff alleges the contract required.

Defendant's argument in favor of its summary judgment motion is as follows: Capital admits that it breached at least five of the six contracts. The breaches were material, and therefore the Forest Service was justified in terminating its contracts, reselling the contracts, and demanding damages resulting from Capital's breach. A formula for calculation of damages if plaintiff breaches its obligation to cut the timber is set out in each contract as "Provision C9.4: Failure to Cut". Under Provision C9.4, damages are to be the amount by which the original contract value, plus the cost of resale, less any effective purchaser credits [2] remaining at the time of termination, exceeds the resale value of the contract.[3] As the damage calculation formula is laid out in the contract, and as plaintiff Capital admits to breaching the contracts, plaintiff thereby becomes subject to the contractually agreed upon damage calculation clause, Provision C9.4. Thus, defendant asserts, there is no dispute as to material fact and the government is entitled to contractually determined damages as a matter of law.

Plaintiff asserts that defendant hasn't proved the accuracy of its calculation of damages due, and that, for several reasons, plaintiff does not owe defendant any damages at all. Capital moves for summary judgment based on three main grounds:

1. Capital argues that it is immunized from liability for damages because the defendant resold, (or attempted to resell) the timber which constituted the subject of the contracts on substantially different terms. By doing so, plaintiff asserts that the government lost the right to pursue a damages claim against the plaintiff, for reasons stated in *United States v. Axman*, 234 U.S. 36, 34

---

**2.** Purchaser's credits are credits earned by the purchaser for construction of specified roads in conjunction with performing a timber contract.

**3.** See Provision C9.4, Appendix to Defendant's Motion for Summary Judgment as to 750–87C at A–16 (February 12, 1993).

S.Ct. 736, 58 L.Ed. 1198 (1914), and later cases.

2. Capital claims that any damages resulting from the breach are already mitigated and/or no compensable damages have occurred.

3. Capital asserts that Provision C9.4 is either a) intended to be a liquidated damages clause and unenforceable as a penalty or b) supposed to calculate the common law damages suffered—in which case it is also invalid because the formula it prescribes does not arrive at an accurate common law damages assessment, but rather a much higher figure. Also, as regards the Cow contract, Capital argues that the government first breached the contract by refusing to grant an extension of Capital's performance period.

■ 1. Plaintiff argues that, even if it would otherwise be liable for breach of contract, defendant is not entitled to collect damages from plaintiff in this instance because the contracts were put up for resale on substantially different terms from the original contract. Plaintiff cites *United States v. Axman*, 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198 (1914) to support this argument. *Axman* involved a contract between defendant Axman and the federal government to dredge San Pablo Bay in California. The dredged material was to be deposited in one particular area, specified in the contract. Axman (due to equipment limitations) was unable to deposit the materials in the specified area in a timely fashion, so he requested permission to dump the materials in another location. The government refused Axman's request, and Axman therefore could not perform the contract. The government then resold the contract. However, the resale contract expressly allowed the second contractor to deposit dredged material in the location where Axman had been refused permission to dump. The United States then sued Axman for the price difference between the original and the resale contracts. The Supreme Court in *Axman* held that when, after default of the original contractor, the government resells a contract, the original contractor cannot be required to pay the difference in price between the two contracts when, "the work done under the second con-

tract was not the work which the first contractor had agreed to perform." *Id.* at 45, 34 S.Ct. 736. More concisely, where the government resells a contract to a second contractor on substantially different material terms, the government is precluded from recovering damages from the original contractor. *Id.* at 36, 34 S.Ct. 736.

■ Plaintiff Capital alleges that the terms and conditions of the resale contracts (or appraisals of the resale offerings, for those contracts for which there were no resale bidders) were altered to such an extent by the Forest Service that the government is precluded from seeking damages for breach.

It is useful at this point to offer a brief description of the major components of and the bidding process for U.S. Forest Service timber contracts. For each timber contract offered for sale, the Forest Service puts out a "prospectus" describing the timber site and the terms on which the contract is offered. The minimum opening bid price is based on various factors laid out in the prospectus. The main factor in determining the minimum bid price is the Forest Service's estimate of the type and quantity of trees found on the site (to which it assigns a base price). Added to this base price is an estimate of reforestation costs (also known as "KV" costs). Reforestation costs are the cost of planting new trees to replace those felled by the contractor. The Forest Service performs this task and charges the costs of it to the contractor. The contract also provides for "purchaser credits" which are intended to compensate the contractor for building and maintaining roads on the site. As the roads are built, the contractor will receive a credit against the contract price he owes to the Forest Service. The amount of credit awarded for a set amount of road is laid out in the contract. The prospectus also sets the length of time which the contractor will be allowed to complete performance of the contract.

For some of the original and most of the resold contracts at issue in the five cases before the court, the prospectus also stated that a certain percentage of the bid price was due up front, as a down payment, and that an additional percentage of the bid price was

due at a date before the contract was completed (a "mid payment"). The contract terms laid out in the prospectus and those in the final contract are not open to negotiation. This court has in the past held that Forest Service timber contracts are contracts of adhesion. *See, e.g., Everett Plywood Corp. v. the United States,* 227 Ct.Cl. 415, 418, 651 F.2d 723 (1981).[4] Interested parties are then invited to bid on the contract described in the prospectus, based on the information provided in the prospectus and the bidders' own examination of the site. While the actual sites of the original and resale timber contracts in the cases before us remained the same, some of the terms in the resale contracts were changed. The substantiality of these changes is a matter of dispute between plaintiffs and defendant.

In *Capital Development,* the resale contracts did differ from the original contracts in several ways. The cash down payment requirement on all of Capital's contracts was doubled, from five to ten percent. Midpoint payments were also added or increased on several of the contracts. Reforestation costs were decreased in three contracts, and increased in two, the Cougar and Short Flat contracts, the only contracts for which there were no resale bidders. Road construction purchaser credits were also lowered in three contracts. Plaintiff argues that these and other changes in the terms of the resale contract constitute substantially different terms, thus barring the government from collecting damages under the principle articulated in *Axman.* The government says that the resale contracts are contracts for cutting and removal of the same timber specified in the original contracts, that the work required by each contract is identical, and that any differences in contract terms are not of a nature which would allow plaintiff to invoke the *Axman* defense.

*Axman* has been followed by the Court of Claims since 1914 and is still good law. For instance, in *Schwartz v. United States,* 106 Ct.Cl. 225, 65 F.Supp. 391 (1946), a Navy office advertised for and contracted with Schwartz to build an office communications system. Schwartz installed a loud speaker system, which proved to be inadequate. So the Navy hired a replacement contractor who installed an acceptable telephone-based communications system, at a much higher cost. The Navy then sued Schwartz, the first contractor, for the difference in price. The Court of Claims, applying *Axman,* held that the second system was too different from the first system for the plaintiff to be responsible for the difference in contract price. The Court stated that the government cannot get damages from the original contractor when, "in the reletting there is a material or substantial departure from the original contract terms." *Id.* at 393, 106 Ct.Cl. 225.

The government argues that the key factor leading the courts to deny the government's right to recovery in cases like *Axman* and *Schwartz* was that the performance required under the original and the resale contracts changed. The original contract in *Axman* required discharge to be dumped in one location and the resale contract allowed the discharge to be dumped in another place. And in *Schwartz* the second communication system installed was a different type of system than that installed in the first contract. Whereas in all the contracts at issue in the five cases before the court, the performance required, chopping down all the trees in a given area, remained the same in both the original and resale contracts. The only changes involved the length of performance time and financing terms.

In *Eagle Aviation, Inc. v. the United States,* 9 Cl.Ct. 128 (1985), which involved reletting a U.S. Postal Service contract to transport mail by air, the only difference in the contracts (other than the fact that the resale contractor charged a higher rate) was that the original contract was for a specific period of time (25½ months) and the relet contract was for an indefinite term, not to exceed 180 days. The court held the original contractor properly liable to the Postal Service for the difference between the original and the new rate, as the two contracts were,

---

4. In *Everett,* the court held that Forest Service lumber contracts were contracts of, "adhesion in that bidders had to accept the contract terms the government wrote into the invitation, only the price being open for the bidder to specify." *Id.* at 418.

"identical in all respects to those of plaintiff's terminated contract with two exceptions: the contract rate and duration of contract terms...." *Id.* at 134. One of the factors which led the Court to conclude that the higher rate charged in the reletting contract was not due to the shortened term was that the second contractor had bid on the original contract as well, and the rate he bid on the original contract was higher than the rate at which he agreed to perform the relet contract. However, in a different type of contract, length of time of performance might be a more significant price-influencing factor than it was in *Eagle Aviation.*

There is the additional possibility that changes in a resale contract might not be great enough to make the resale contract substantially or materially different, but would still be great enough to reduce the amount of damages which the government was allowed to collect. For example, in *Consolidated Airborne Systems, Inc. v. the United States,* 172 Ct.Cl. 588, 348 F.2d 941 (1965) the court held that a change in the quantity of items contracted for did affect the price charged in the resale contract, but that the change wasn't substantial enough to release plaintiff from paying damages. Instead, damages were merely decreased by the amount of the price variation due to the greater per item cost for producing a lesser quantity of the items.[5]

The Second Circuit found, in *Doehler Metal Furniture Co. v. United States,* 149 F.2d 130 (2d Cir.1945), a case where the relet contract differed from the original contract only in that the relet contract had a liquidated damages clause, while the original contract did not, that the mere addition of a liquidated damages clause was an insufficient change to defeat the government's claim for damages due to the higher price paid in the resale contract. On a motion for summary judgment not unlike this one, the *Doehler* court held that the effect of the liquidated damages clause on the price of the resale contract was a fact issue to be decided at trial, but that the change was not of sufficient magnitude to nullify the government's damage claim under the *Axman* doctrine. The court wrote, "Where the goods to be delivered under the two contracts are precisely the same and the only difference is an added item of obligation which enhances the cost in an ascertainable amount, the comparison, once the cost of that item is deducted from the price in the second contract, is unimpeachable." *Id.* at 134–35. Two points can be derived from *Doehler.* First, the extent of the effect contract changes have on contract price may properly be a fact issue and should not be decided on a motion for summary judgment. Second, in *Doehler,* the added feature (the liquidated damages clause) increased cost by an "ascertainable amount" and so could be factored in in computing a proper damage award. But one can infer that if the amount of the cost increase were not ascertainable, perhaps *Axman* would apply to disallow damage collection.

*American Surety Co. v. the United States,* 317 F.2d 652 (8th Cir.1963), a case in which the trial court found that there was no material deviation between the original and the resale contract, clearly explains the law as regards material variations in relets of government contracts. Usually, the "measure of damages will be the sum by which the reasonable cost of having the work done by another contractor exceeds the defendant's contract price." *United States v. Conti,* 119 F.2d 652, 656 (1st Cir.1941). Nevertheless, "where the second contract materially deviates from the first, 'the difference in cost between the familiar rules applicable to this subject' is not the standard." *United States v. California Bridge and Constr. Co.,* 245

---

5. *Consolidated* involved the sale of certain electronic equipment to the Navy and the Army Signal Corps. After the first contract was breached, the Army decided that it no longer required its portion of the order, so the resale contract was only for the equipment required by the Navy. The court noted that its decision would have been different if there had been changes in the equipment ordered. "Substantial and material differences in the physical characteristics of supplies repurchased, as contrasted with those specified in a defaulted contract, have been repeatedly held to be such a material deviation as to render the defaulting contractor not liable in accordance with the contract terms for excess costs incurred in the repurchase of allegedly 'similar' supplies." *Id.* at 947. The court then went on to cite *Axman* and other cases following *Axman.*

U.S. 337, 344–45, 53 Ct.Cl. 620, 38 S.Ct. 91, 94, 62 L.Ed. 332 (1917) (quoting *American Surety* at 657). In *California Bridge*, a case involving a resold contract to construct various buildings at a U.S. naval yard, four supplemental contracts, added to the resale contract, required changes that had a value of approximately 6% of the total contract price. This was sufficient to make the work from the second contract no longer substantially similar to the work required by the first contract. Thus the government was denied its right to recover the price differential from California Bridge.

But in *Mega Constr. Co.,* 29 Fed.Cl. 396 (1993), this court commented that, "Courts have often approved reprocurements on somewhat different terms than the defaulted contract." And that, "(A) reprocurement contract need not be identical to the original contract if excess costs can be calculated and if the contract is capable of a reasonable adjustment. . . ." *Id.* at 484. The court went on to allow the original contractor some equitable adjustment in the damages he was required to pay when the price of the resale contract was higher than that of the original contract.

The degree to which the changed terms altered the Capital Development contracts is still factually unclear. Some of the contract terms were different, and the differences may have been great enough to constitute a material alteration. It does seem that changes were such as to make the resale bids lower than they would have been had the resale contract been identical to the original. For instance, on contracts where the resale performance period was shorter than in the original, the contractor would necessarily have to work faster, and perhaps pay workers overtime or use different, more expensive equipment to complete cutting in a timely fashion. A contractor would not be willing to pay as much for a contract which would be more expensive to perform. Or if, as in *Merrill,* discussed *infra,* the Forest Services' estimates of the amount of timber on the site to be cut changed, the bid price likely would differ accordingly. And while the Forest Service does not guarantee the accuracy of its estimates and the contractor is required to cut all of the wood found on the site even if that amount far exceeds the estimated amount, the estimate would at least change what the contractor was bidding on. Having to come up with a larger down payment and a midpoint payment would also affect the amount a contractor was willing to bid. However it is not clear purely as a matter of law whether these and other changes are sufficient to materially alter the terms of the contracts at issue.

Summary judgment is not appropriate on this issue because examination of the pleadings reveal that a genuine issue of material fact exists as to whether the contract terms were sufficiently different in a material way so as to allow the *Axman* defense. The terms of the original and the resale contracts did vary to some degree, but a trial is required to determine whether these differences had such an impact on the resale contract price so as to preclude the government from collecting damages from plaintiff or to decrease the amount of damages that plaintiff is required to pay.

2. Capital also alleges that the changes in contract terms, which decreased the amount bid on resale, were not properly taken into account in calculating damages, even if those changes do not make the contract materially different under *Axman.* Capital argues that damages would be mitigated or eliminated by properly accounting for those changes in contract terms. Plaintiff says that while changes in the proper amount of damages as a result of resale would normally be a question of fact, since defendant has offered no evidence refuting plaintiff's fact evidence in this regard, plaintiff is entitled to judgment as a matter of law. While defendant did not address plaintiff's allegations in this regard extensively, the court is persuaded that summary judgment on this matter is not appropriate, particularly as the damage calculation issue is so interwoven with plaintiff's *Axman* claims and plaintiff's complaints about Provision C9.4.

3. Capital argues that Provision C9.4 of the original contracts is either a) a liquidated damages clause or b) mandates an inaccurate calculation of common law damages for breach. If C9.4 is a liquidated damages

clause, Capital asserts that it is invalid as an unlawful penalty for two reasons. First, because changes in the contract had a suppressing effect on bidding on the resale contract. And secondly, because the Forest Service's method of appraising the contracts to set a minimum resale bid and to determine the amount of damages owed on contracts which were not resold, was done in a way that improperly inflated the amount of damages owed to the government. According to a deposition of George M. Leonard, former Associate Chief of the Forest Service, submitted by plaintiff, the appraisal value given to a contract varies from that value arrived at by the market.[6]

█ If C9.4 is, on the other hand, viewed as merely instructing the parties on how to calculate standard common law damages, Capital asserts that the provision is still invalid because the formula it prescribes does not produce an accurate calculation of common law damages incurred. Under federal law of contract damages, defendant may recover only the, "difference between contract price and market value at the times when and the places where delivery should have been made." *U.S. v. Burton Coal,* 273 U.S. 337, 340, 63 Ct.Cl. 678, 47 S.Ct. 351, 71 L.Ed. 670, (1927).

█ Liquidated damages clauses are generally upheld by courts so long as three factors are present: First, the injury caused by the breach must be difficult or impossible to estimate accurately; second, "the parties must intend to provide for damages rather than for a penalty," and; third, "the sum stipulated must be a reasonable pre-estimate of the probable loss."[7] The Court of Federal Claims in prior case law has held Provision C9.4 and similar damages calculation provision B9.4 to be valid and enforceable. While

Provision C9.4 appears in all of the *Capital Development* contracts, the four other cases discussed later in this opinion used the older, B9.4 clause.

█ Provision B9.4 and C9.4 are identical in their formulation of how to calculate damages in a contract which has not been resold. Both provide that if a party breaches without completing his contract, the Forest Service shall make an appraisal of the value of the remaining timber using, "the standard Forest Service method in use at time of termination." If the contract is not resold, both provisions provide that, "damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and Effective Purchaser Credit."[8] In *Madigan v. Hobin Lumber Company,* 986 F.2d 1401 (Fed.Cir.1993) the Federal Circuit, reversed the United States Department of Agriculture, Board of Contract Appeals decision, and held that the United States was entitled to contract damages as calculated under Provision B9.4 of a Forest Service timber contract, even though the Forest Service later decided not to resell the contract, but instead to preserve the area as a habitat for the northern spotted owl. In another opinion, *Hoskins Lumber Co., Inc. v. the United States,* 89 F.3d 816 (Fed.Cir.1996), the Federal Circuit reversed this court. In that opinion it addressed the fairness of the appraisal prescribed in Provision B9.4 more directly. Hoskins Lumber alleged that the Provision B9.4 damage calculation could not fairly be used, because the government, by choosing not to resell the contract but to instead protect the spotted owl[9], had not been damaged. The court held that Hoskins, "was emphatically not entitled to a 'fair' appraisal, an 'accurate' appraisal, a 'reasonable'

---

6. Supplemental Appendix to Plaintiff's Reply Brief, Deposition of George M. Leonard at Tab 16 (October 5, 1993). Mr. Leonard was Associate Chief of the Forest Service with the Forest Service at the time the deposition was taken.

7. Calamari and Perillo, *Contracts* 640–641 (3d ed.1987). See also an extensive discussion of liquidated damages in the Federal Circuit's decision in *DJ Manufacturing Corp. v. United States,* 86 F.3d 1130 (1996), *aff'g* 33 Fed.Cl. 357 (1995).

8. Provision C9.4 at A–16, Appendix to Motion for Summary Judgment as to 750–87C (February 12, 1993). Provision B9.4 at 39, Appendix to Defendant's Motion for Summary Judgment as to *Merrill & Ring, Inc. v. United States,* No. 95–85C (January 22, 1993).

9. As in *Hobin Lumber,* in *Hoskins* the Forest Service declined to resell the contract, instead preferring to preserve the area as a habitat for the spotted owl.

appraisal, or any manner of appraisal other than the one indicated in section B9.4." In sum, strong precedent from this court and the Federal Circuit has held Provisions B9.4 (and C9.4, because language is identical) to be a valid way of measuring damages in a timber contract in which there is no resale.

■ Turning to the contracts which were resold: B9.4 and C9.4 do differ slightly as regards calculating damages in cases of resale (and most of the contracts at issue in the five cases currently before the court are resale contracts). Both B9.4 and C9.4 provide that damages shall be the amount by which current contract value minus resale costs, "less any Effective Purchaser Credit remaining at the time of termination, exceeds the resale value at new bid rates." C9.4 also requires the breaching party to pay any increased reforestation and purchaser credit costs which are included in the resale contract, as well as interest due to delayed receipt of stumpage payments for the period of time for which those stumpage payments were delayed. This court has upheld the validity of Provision C9.4 as applied to resale contracts as well. *See, e.g., Engle Investors v. United States,* 21 Cl.Ct. 543 (1990). The issue in *Engle* was whether the government forfeited its right to damages after reselling a timber contract for a lower price than the original contract because it failed to mitigate damages.[10] The *Engle* court held, however, that even if damages were not properly mitigated, "section C9.4 ... provides the correct damage starting point." *Id.,* at 549.

■ The *Engle* court stated: "The court concludes that defendant was required to calculate damages in accord with the provisions (section C9.4) of the defaulted contract. This was what the parties agreed to in the event of contract termination, and this is what the parties had a right to expect when termination occurred." *Id.* at 549 (citing *Everett,* 206 Ct.Cl. at 254–56, 512 F.2d at 1088–89 (1975)). "In seeking damages, defendant must rely on the express terms of the contract." *Id.* Changes in the resale contract,

etc., which may have affected the price obtained on resale may indeed be appropriately factored in determining actual damages due. For example, in *Engle, id.* at 549, n. 11, the Forest Service, of its own initiative, had even made some adjustments as to amount of damages owed due to increased down payment and mid payment requirements in the resale contract at issue in that case. However, as a point from which to start, there is nothing inherently unjust in the C9.4 formula, as the *Engle* court held. But, there do remain questions of fact as to the extent damages calculated under this clause should be modified due to changes in the resale contract. Plaintiff's argument that the C9.4 damages clause is void as a penalty must be rejected. However *Engle* allowed for the possibility that changes in the resale contract might change the amount of damages due. C9.4 is the starting point for damages calculations, as contractually agreed. But a trial is required on the fact question of to what extent, if any, damages should be reduced or eliminated due to changes in the resale contract.

■ Finally, the court turns to the Cow contract. Capital alleges that the Forest Service was actually the breaching party in this contract, the breach consisting of not granting Capital an additional extension after Capital had diligently performed. At issue here is whether the Forest Service routinely granted extensions and therefore its failure to grant an extension to Capital Development was arbitrary and unfair to a degree amounting to breach of contract. The Forest Service claims that parties are not allowed to receive more than one extension—but this one extension only policy is not stated anywhere in the Forest Service's regulations. Whether or not plaintiff was diligent, what the Forest Service's policy regarding extensions was, and also whether plaintiff, as the Forest Services alleges, "abandoned" the Cow contract are all fact questions. And the facts, unfortunately, are not clear enough based on the parties' depositions, etc. to de-

---

**10.** In *Engle,* the government had a contractual duty to mitigate damages. The contracts at issue in this case state explicitly that the government is not required to mitigate damages. But whether or not mitigation was required, the standard for when the government loses the right to damages under *Axman* remains the same.

cide this issue on a motion for summary judgment.

■ In *Capital Development*, the government invokes the sovereign acts doctrine to argue that, because increased down payment and midpoint payments in the resale contracts were mandated by federal statute [11], the Forest Service cannot be held responsible for any decrease in the resale bids due to those changes. Under the sovereign acts doctrine, the government as contractor cannot be held responsible for public and general acts taken by the government as sovereign. This principle was laid out in *Jones v. United States*, 1 Ct.Cl. 383 (1865), one of the earliest cases decided by this court. "Whatever acts the Government may do, be they legislative or executive, so long as they be public and general [those acts] cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which [the government] enters with private persons." *Id.* at 384, 1865 WL 1976. If the changes in the resale contract were mandated by federal law, the government argues, its right to recovery of full damages cannot be reduced or denied, even if the change was great enough to make the resale contract materially different from the original.

■ The sovereign acts doctrine is intended to put the government in the same position as a private contractor when the government is acting in its contractual capacity. It is intended to be used as a defense by the government if the government is sued for breach of contract. That defense may be used when government, as sovereign, takes actions not directed to the specific contracts, which if taken by the government as contracting party would amount to a breach. However, in order for the sovereign acts doctrine to apply, the sovereign act by the government must be public and general. It cannot be a narrowly targeted act intended to relieve the government of its contractual obligations. The sovereign acts doctrine is

intended to put the government on an equal footing with private contractors, not to give it a way out of contracts it considers undesirable. This distinction was most recently addressed in *United States v. Winstar Corporation, et. al*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

*Winstar* involved the statutory annulment of contracts entered into in the 1980's between the Federal Savings and Loan Insurance Corporation (FSLIC) and various private investors, in which the investors agreed to take over failing thrifts in a series of "supervisory mergers." As an incentive to take over these ailing institutions, whose liabilities exceeded their assets, the FSLIC agreed to help the acquiring institutions meet the capital reserve requirements mandated by federal regulations by allowing them to use a special method of accounting in which the excess of their purchase price over the fair value of the thrifts would be designated as an intangible asset known as "supervisory goodwill." This goodwill would be allowed to be used to fulfill federal capital reserve requirements. Then, in 1989, Congress passed the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) [12] which, among other things, disallowed the use of supervisory goodwill in calculating capital reserve assets. Because of this new law, the three thrifts which were plaintiffs in *Winstar* fell out of compliance with federal requirements and two of them subsequently failed and were taken over by the Resolution Trust Corporation (RTC). When the thrifts sued the government for breach of contract, one of the government's defenses was that because FIRREA was an act of the government as sovereign, the government as contractor could not be held liable for its contractual breach.

The Supreme Court dismissed this argument on the grounds that the FIRREA provision which invalidated the accounting method agreed upon in the contracts was not a

---

**11.** See Federal Timber Contract Payment Modification Act, Pub.L. No. 98–478, 98 Stat. 2213 (1984), codified at 16 U.S.C. § 618(d). The purpose of this law was to discourage speculative bidding on federal timber contracts (by bidders who would not be able to perform if awarded the contracts). The specific amount and timing of

payments required to conform with the new statute are set out at 36 C.F.R. §§ 223.49, 223.50 (1986).

**12.** Pub.L. 101–73, 103 Stat. 183.

public and general act, and the government thus was not protected under the sovereign acts doctrine. The Court held, "a government act will not be public and general if it has the substantial effect of releasing the Government from its contractual obligations ..." "[I]n the present case it is impossible to attribute the exculpatory 'public and general' character to FIRREA." *Id.* 116 S.Ct. at 2467. This is because FIRREA targeted this specific set of government contracts with private entities to take over failing thrifts and deliberately breached those contracts.

 In the instant case, the law mandating changes in the down payment and mid payment requirements are similarly targeted to affect only specific types of contracts between the Forest Service and private contractors. And while the government has the power to make those changes in the law and to make new timber contracts comply with these changes, it cannot invoke the sovereign acts doctrine to retroactively make contractors who contracted before the new requirements were enacted, responsible for increased damages due to the changes. The government's sovereign acts defense is not applicable as a sword in these circumstances.

### Cascade Resources

Plaintiff Cascade Resources ("Cascade") entered into a timber sale contract with the Forest Service, known as the "Olo Too" contract, in 1981, with performance scheduled to be completed on March 31, 1984. Plaintiff was granted a conditional extension of terms until December 29, 1985, but the contract was still incomplete as of that date. The Forest Service resold the Olo Too contract on July 17, 1987, with a termination date of December 31, 1988. The Forest Service then demanded damages from Cascade as calculated in accordance with the damages provision found in the contract (Provision B9.4, discussed *supra*, which was similar to the C9.4 provision found in the Capital Resources contracts). Cascade then filed this lawsuit appealing the contracting officer's fi-

nal decision. Both Cascade and the government have filed motions for summary judgment.

Cascade argues that its motion for summary judgment should be granted on four main grounds. First, Cascade argues that its performance is excused because the Forest Service committed a prior material breach of the contract by refusing to grant a contract term adjustment as required by the contract's "force majeure" clause. Second, Cascade argues that its performance is excused under the contract law doctrines of commercial impracticability, impossibility of performance, and frustration of purpose. Third, Cascade asserts that the government's claim for damages is barred because the Forest Service resold the timber on terms materially different from those in the original contract.[13] Finally, Cascade claims that the original and resale contracts were illegal, and thus bar the government's claim for damages.

 1. Force majeure. Provision B8.21 of Cascade's contract with the Forest Service provides that the agreement may be modified under certain circumstances. Under this "force majeure" provision, the Forest Service may grant a contract adjustment if the purchaser experiences delay or interruption in harvesting timber for ten or more consecutive days due to causes beyond the purchaser's control. Factors which may merit a readjustment include, e.g., acts of God, acts of a public enemy, labor disputes, fires, insurrections, floods, and, most significantly for Cascade's argument, acts of government.[14] Cascade alleges that the monetary policies of the federal government which precipitated the collapse of the timber market in the early 1980's constitute an act of government for the purposes of invoking the force majeure clause in the timber contract.

One problem with this argument is that the terms of the contract require the purchaser to give written notice that it is seeking an adjustment at least ten calendar days before the contract's Termination Date.

---

13. This is the same argument, based on the *Axman* line of cases, made in *Capital Development.*

14. Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross Motion for Summary Judgment at 9–10.

Plaintiff Cascade failed to give such notice. Cascade asserts in defense that the Forest Service had a policy of not granting adjustments for what it considered "market related conditions" and that it would have been an "exercise in futility" for plaintiff to make such a request, and that Cascade was therefore excused from the notice requirements by, "the defendant's rigid attitude which would have resulted in the denial of any request for contract term adjustment." [15]

For the moment, the court will disregard plaintiff's failure to make the request for an extension (which alone might be sufficient to defeat plaintiff's summary judgment motion on this issue) and instead look to whether the economic policies of the federal government in the early 1980's were of a nature to qualify Cascade for relief under the B8.21 force majeure provision. While there is no case from this court specifically addressing whether changes in federal monetary policies constitute an act of government for purposes of a force majeure clause, cases addressing similar issues in other federal courts have consistently held that market-changing governmental policies should not be considered acts of government for force majeure clause purposes.

In *Langham–Hill Petroleum Inc. v. Southern Fuels Company*, 813 F.2d 1327 (4th Cir.1987), the government of Saudi Arabia, in an attempt to regain its share of the world oil market, caused a collapse in world oil prices that made appellant Langham's fixed price contract to buy oil from appellee disastrously unprofitable. Langham breached this contract and argued that a force majeure clause found in the contract should validate his refusal to honor his contractual obligations.

The force majeure clause in the *Langham* contract applied if a party was rendered unable to perform by a "cause of any kind not reasonably within its control," including, among other things, "any restrictions or restraints imposed by laws, orders, rules, regulation or acts of any government or governmental body or authority." *Id.* at 1329 n. 1. The *Langham* court found that the act of the

Saudi government did not make appellant unable to perform. It merely made performance unprofitable. It should also be noted that this effect was quite indirect, unlike an order embargoing timber or restricting its removal. "A force majeure clause is not intended to buffer a party against the normal risks of a contract. The normal risk of a fixed price contract is that the market will change," wrote the court. *Id.* at 1330 (quoting *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265, 275 (7th Cir.1986)).

Likewise, in *Cascade*, the government's acts (its monetary policies) may have contributed to the changes in the timber market which made Cascade's performance unprofitable. But the changes did not prevent Cascade from performing. They merely made performance unprofitable.

*Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265 (7th Cir.1986) also supports this finding. In *Northern Indiana* a force majeure clause in the contract for plaintiff to buy coal from defendant was drafted to provide protection for Northern if it were prevented from taking delivery of coal, " 'for any cause beyond [its] reasonable control ... including but not limited to ... orders or acts of civil ... authority ... which wholly or partly prevent ... the utilizing ... of the coal.' " 799 F.2d at 274 (alterations in original). The *Northern* court held that a government order which prevented plaintiff from passing along increased coal prices to the public did not prevent plaintiff from utilizing the coal. It just made performance economically unattractive. Judge Posner's opinion concluded with the language later quoted in *Langham, supra* (not intended to buffer a party against normal risks). *See also United States v. Panhandle Eastern Corporation*, 693 F.Supp. 88 (D.Del.1988) (holding that changes in the natural gas market, partly caused by federal legislation, which increased natural gas prices, did not trigger the force majeure clause in defendant's contract to excuse defendant's breach).

---

**15.** Response to Interrogatory No. 1, Plaintiff's Response to First Set of Interrogatories and First Requests for Production of Documents at 2.

■ As the above cases demonstrate, government policies which do not prevent performance but merely make performance unprofitable are not the sort of government policies referred to in a typical force majeure clause. Parties cannot invoke force majeure clause protection merely because they are experiencing financial difficulties that are arguably caused by general government policies.

This court has also held, in cases like *Southeastern Airways Corp. v. United States*, 230 Ct.Cl. 47, 63, 673 F.2d 368, 377 (1982), that financial difficulty is not sufficient grounds to prevent a party from being held liable for default. *Southeastern Airways* involved plaintiff's appeal from the termination for default of two air taxi mail service contracts into which it had entered with the U.S. Postal Service. One of plaintiff's planes was seized by a creditor and plaintiff could not afford to rent another plane. The court held that the plaintiff's inability to rent another plane was due to financial difficulty, and that financial difficulty was not sufficient grounds to prevent plaintiff from being held liable for default. It was not a cause beyond the contractor's control. *Id.* at 377.

The interruption in Cascade's removal of timber was not caused by the government's monetary policy. It was caused by, if anything, Cascade's fear of financial loss and the possibility of insolvency. And the B8.21 force majeure provision in Cascade's contract says nothing about allowing contract adjustment if it appears that performance may render Cascade insolvent. If a contractor's state of solvency were to be considered "beyond his control" then a financially unstable party would be able to enter into risky contracts with impunity, knowing that if luck went against it, it would be excused from performance. This is not the law.

Changes in the federal government's monetary policy cannot be considered to constitute the type of act of government which stops the removal of timber. Particularly since a great many other timber companies did manage to perform on their contracts during the period in question. Thus the court denies Cascade's motion for summary judgment on this ground.

2. Cascade also argues that the contract law doctrines of commercial impracticability, impossibility of performance, and frustration of purpose excuse Cascade's performance of their contract. For the following reasons, the court denies Cascade's motion for summary judgment on all of these grounds.

■ a) Commercial impracticability. A party may invoke the doctrine of commercial impracticability as a defense to performance of a contract when it can show that it had the ability to perform a contract at the time it entered into the contract, but that circumstances changed due to events beyond the party's control, which rendered performance commercially impracticable. Plaintiff Cascade asserts that the government policies which reduced inflation and reduced the available supply of money for housing directly reduced the demand for lumber and caused prices for timber to be dramatically lower than they were at the time the contract was concluded, thus rendering the contract commercially impracticable.

A brief review of the Restatement of Contracts dispatches this argument. The Restatement sets forth the doctrine of commercial impracticability as follows:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a *basic assumption* on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate to the contrary.

*Restatement Second of Contracts* § 261 (1981) (emphasis added). Comment b) to this section of the Restatement adds that "[T]he continuation of existing market conditions and of the financial situation of the parties are ordinarily not such assumptions, so that mere market shifts or financial ability do not usually effect discharge under the rule stated in this section." Plaintiff has offered nothing to rebut this presumption that market shifts generally do not support the defense of commercial impracticability. If contracts were found to be breachable under

such circumstances, there would be few contract breaches which could not be defended against based on such a claim. The state of the market is one of the things on which the parties are gambling when the contract, or bid in this case, is made. The court cannot, therefore, grant the plaintiff's motion for summary judgment on this basis.

 b) Impossibility of Performance. Plaintiff Cascade also seeks to invoke the related defense of impossibility of performance. The doctrine of impossibility of performance provides that when a condition which is part of a contract becomes impossible for a party to perform, that condition will be excused. Cascade argues that market changes drastically reduced the demand for timber. According to plaintiff's theory, this change made the contract impossible to perform, thus excusing plaintiff's breach.

 However, this court has held on numerous occasions that contract performance is rendered impossible only when it is objectively determined that no contractor could perform the work. *See, e.g., Oak Adec, Inc. v. United States,* 24 Cl.Ct. 502, 506 (1991); *Natus Corporation v. United States,* 178 Ct.Cl. 1, 10, 371 F.2d 450, 456 (1967). The objective behind this rule is to place the burden of performance on the party who originally accepted that burden, absent rather limited circumstances. This not only preserves the integrity of freedom of contract, but it also serves economic efficiency by the most rational allocation of risk and performance resources. The government's affidavits establish, and plaintiff does not dispute, that many other contractors performed on timber sale contracts which were awarded during the same period as Cascade's. These contractors managed to perform despite depressed market prices. The market fluctuation did not make Cascade's performance impossible, merely uneconomical. Thus contract performance was not objectively impossible, as case law requires for this doctrine to apply, and plaintiff's motion for summary judgment on this basis must also fail.

 c) Frustration of Purpose. The doctrine of frustration of purpose excuses performance by a party where the value of the performance to at least one of the par-

ties, and the basic rationale recognized by both parties entering into the contract, has been destroyed by a supervening and unforeseen event. *See, e.g.,* Williston 18 *Contracts* § 1935 (3d. ed. 1978); *Transatlantic Financing Corp. v. United States,* 363 F.2d 312, 319 (D.C.Cir.1966). Plaintiff argues that its purpose in entering the contract was to earn a profit. Plaintiff alleges that due to government policies that increased interest rates, reduced the anticipated inflation rate, and reduced demand for timber, timber prices were dramatically lower than anticipated. None of these occurrences were foreseen when the contract was formed. According to the plaintiff, the harvesting of timber under such circumstances would have resulted in a devastating loss, thereby completely frustrating the purpose of the contract. Thus plaintiff argues that its performance should be excused.

The Restatement of Contracts requires that three criteria must be met before courts will find frustration of purpose:

First, the purpose that is frustrated must have been a principal purpose of that party in making the contract ... The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made.

*Restatement 2d, Contracts* § 265 comment a) (1981).

Presumably only the rare business contract is made without the expectation of profit. Cascade's argument, taken to its logical conclusion, would require the court to eliminate virtually all risk from commercial contracting by allowing any contractor to escape its obligations if market conditions eliminated its hope of obtaining a profit. Further, as

the comment to the Restatement demonstrates, a lack of profit is generally insufficient to frustrate the purpose of a contract.

By agreeing to a fixed-price contract, both the Forest Service and Cascade Resources bore some risk of fluctuation in the market. Presumably, plaintiff would not have had to disgorge the profits earned if the market price for timber had risen. Fluctuation in the other direction cannot now be used to support a claim of frustration of purpose. Plaintiff's motion for summary judgment is denied on these grounds as well.

3. Material differences between the original and the resale contracts bar defendant's recovery. Plaintiff Cascade here makes the same argument put forward by Capital Resources, alleging that the government is unable to collect damages because it resold the contract on substantially different terms from the original, and cites *Axman* and other cases in that series to support this claim. In *Cascade,* the resale contract did differ in several respects. Most notably the resale contract required a mid payment and a higher down payment. The court denies Cascade's motion for summary judgment on these grounds for the same reasons that it denied that of Capital Resources. Disputed issues of fact exist as to whether the resale contract was sufficiently different from the original contract to preclude the government's right of recovery. A trial is required to answer this question.

4. Illegality of the original and resale contracts (bar defendant's claim). Plaintiff's final argument in favor of summary judgment is that the defendant cannot maintain a claim for damages because the original and resale contracts violated requirements imposed by the National Forest Management Act of 1976 (NFMA) [16]. According to plaintiff, the NFMA imposed a 40 acre clear cut limitation in Region 6 national forests, the region in which the Olo Too site was located. The Olo Too sale called for a clear cut of 162 acres, well in excess of the Act's ceiling. Plaintiff argues that this supervening illegality excuses Cascade's non-performance of the contract.

The government disputes this characterization of the NFMA. According to the government, the regulations devised to implement the NFMA provided that until a region adopted a new management plan which conformed with NFMA guidelines, the region was to continue under its current forest management plan. When the Olo Too contract was originally sold, Region 6 had not yet adopted a new plan, and thus was still operating under its old plan, which had no clear cut restrictions. Thus, there was no illegality at the time of the original sale. However, in 1984 Region 6 did adopt a management plan which conformed with the NFMA. Plaintiff argues that since the original contract was not scheduled to expire until 1985, it became illegal when the 1984 plan was adopted. However, nothing in the statute, regulations, or legislative history indicates that the new law should be applied retroactively to abort existing contracts. In fact, the teaching of *Winstar* is to the contrary.

█ It is true that performance of the 1987 resale contract was later enjoined in district court (in *Pilchuck Audobon Society v. MacWilliams,* No. C87–1707R, 1988 WL 159927 (D.Wash. Jan.15, 1988)) because it was held to be in violation of the new 1984 Region 6 guidelines. However, resale is not required in order for the government to collect damages from a defaulting contractor in a timber contract. *See, e.g., Madigan v. Hobin Lumber Co.,* 986 F.2d 1401 (Fed.Cir. 1993); and *Hoskins Lumber Co., Inc. v. the United States,* 89 F.3d 816 (Fed.Cir.1996); both of which held that the federal government can still get damages even if it decides not to resell timber contracts but rather preserve the area for environmental reasons (in these cases, to provide a habitat for the spotted owl.)

█ Plaintiff's claim that the original Olo Too contract was illegal must be rejected. Plaintiff's claim that it need not pay damages because the resale contract was improperly entered into is rejected as well. Resale is not required for a damage award to be properly entered. *See supra,* discussion of contract provisions B9.4 and C9.4 which base

16. 16 U.S.C. § 1600 (1976).

damages on the appraised value of remaining timber after breach by the contractor before completion even where the contract is not resold.

Defendant's Motion for Summary Judgment: Defendant's motion for summary judgment in *Cascade Resources* is essentially the same as that advanced in *Capital Development.* Defendant states that Cascade admittedly breached its contract with the Forest Service, and that the contract itself contains a mutually agreed upon damages calculation provision. Thus, as a matter of law, Cascade owes defendant damages as assessed under the contract provision. Defendant asserts that it is entitled to summary judgment because both liability and damages can be established by reference to the contract terms. Defendant's motion on this ground is denied for the same reason that it was denied in *Capital Development.* Damages cannot be determined until plaintiff's *Axman*-based claim is resolved, and such resolution requires a trial, as explained *supra.*

Sovereign Acts Doctrine: The government raised the sovereign acts doctrine as an additional defense to plaintiff's motion for summary judgment. However, it uses the doctrine to defend itself against different arguments than those asserted against it in *Capital Development.* The government relies upon the sovereign acts doctrine to argue that neither commercial impracticability, frustration of purpose, nor impossibility will excuse contract performance in a situation where the "supervening" events are caused by the government acting in its sovereign capacity. The Supreme Court summarized the sovereign acts doctrine as follows: "It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the participating contractor resulting from its public and general acts as sovereign." *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925). Plaintiff argues that the economic policies promulgated by the federal government were the direct cause of the downturn in timber prices which made performance of the contracts economically un-

feasible. Defendant argues that such acts are immunized from liability by the sovereign acts doctrine. As the Court of Claims held in one of its earliest opinions, the government, acting in its sovereign capacity, "cannot be deemed specially to alter, modify, construct, or violate the particular contracts into which it enters with private persons." *Jones v. United States,* 1 Cl.Ct. 383, 384 (1865).

In the present matter, Cascade attempts to justify its nonperformance based upon the result of actions taken by the government, namely the government's monetary policies, which caused interest rates to rise and inflation rates to fall. These acts were clearly public in nature and may properly be considered acts of the sovereign. They also were clearly not directed against this contract, nor had they any relationship with it. For instance in *Tell v. United States,* 227 Ct.Cl. 519 (1981), plaintiff Tell had leased property to the General Services Administration (GSA) and wanted reformation of that lease because high inflation had greatly decreased the lease's value to plaintiff. Plaintiff claimed that he was entitled to relief because his injury resulted from defendant's own acts in debasing its currency. The *Tell* court held that, "the debasement of purchasing power is a 'sovereign act' not imputable to GSA as a contracting agency." *Id.* at 521, 227 Ct.Cl. 519. A far earlier supporting case is *Deming v. United States,* 1 Ct.Cl. 190 (1865). *Deming* concerned a suit by a supplier of army rations whose costs increased because the federal government passed the Legal Tender Act and placed duties on some of the items required to be included in the rations. The Court of Claims in *Deming* held the U.S. government as contractor not liable for this act of the U.S. government as sovereign, stating that, "in this court the United States can be held to no greater liability than other contractors in other courts." *Id.* at 191. These are only a few examples of a long line of case law supporting the proposition that the United States as contractor is not responsible for the monetary policies of the United States as a sovereign government.

However the court need not address this argument further today, since plaintiff's defenses of impossibility of performance, commercial impracticability, and frustration of purpose fail on their own, without necessitating the invocation of the sovereign acts doctrine.

### Merrill & Ring

*Merrill & Ring* involves one contract, known as the "Break In Salvage" timber sale, awarded on April 10, 1980 to plaintiff, Merrill & Ring, Inc. ("Merrill"). The original termination date of the contract was April 30, 1982, but the Forest Service granted Merrill one extension accompanied by a modification of the contract which allowed Merrill until April 30, 1984, to complete its contractual obligations, provided that Merrill removed all the timber from a specified high priority cutting area within the larger sale area by November 15, 1982. Merrill failed to remove the high priority timber by that date, and after allowing Merrill 30 operating days within which to remedy that omission, the Forest Service terminated and resold the contract in July 1983. Merrill makes almost identical arguments to Cascade in its motion for summary judgment, except Merrill omits the "illegality" argument (i.e., that the contract was void from the outset due to illegality). Merrill argues that: 1) The Forest Service was obligated to grant it an additional extension based on a force majeure clause in the contract essentially identical to that in the Cascade contract. 2) Merrill says that the contract doctrines of impossibility of performance, commercial impracticability, and frustration of purpose excuse it from performing its contract obligations. 3) Merrill says that the government cannot collect damages because the resale contract differed materially from the original contract, and cites the *Axman* line of cases.

The original and resale contracts in *Merrill* did differ in various ways. The resale gave the purchaser only 12½ rather than 15 operating months in which to perform. The resale contract also allowed one month less for the removal of the priority timber which made up between ⅛ (government's estimate) and ¾ (Merrill's estimate) of the total sale volume. And there were apparently large differences in the estimate of volume of timber to be logged between original and the resale contracts. There are no down payment and midpoint payment issues in Merrill, because the resale occurred before the law requiring up front and midpoint payments to be included in Forest Service contracts went into effect, but there appear to be enough differences between the two contracts to make whether the contract was materially changed a fact issue.

Thus, Merrill's first two grounds for the award of a motion for summary judgment are rejected for the same reasons that they were in *Cascade*. See discussion *supra*. Merrill's *Axman*-based motion for summary judgment is also denied, but the *Axman* defense does have sufficient merit to prevent the court from granting defendant's motion for summary judgment.

### Seaboard, Nos. 610–84C & 370–88C

*Seaboard*, No. 610–84C involved two contracts, the "Caraco" contract and the "Nettleton" contract. Both contracts received extensions. Under the terms of the extensions, Seaboard was supposed to make certain cash deposits, which Seaboard did not do. The government then terminated the contracts due to this breach and relet the contracts to other contractors. The resale prices for both contracts were less than the prices Seaboard had agreed to pay, and the government sued Seaboard for damages as calculated in Provision B9.4 of the original contracts. Seaboard admits its breaches but defends that the government breached first.

*Seaboard*, No. 370–88C involved one contract, the "What" contract, which was originally designated to end in 1983 but was extended by the Forest Service until December, 1985. After Seaboard failed to perform the contract in a timely fashion, the Forest Service terminated its contract and relet the contract to a second contractor for a lower price than the original. The Forest Service then sued Seaboard for damages as calculated in Provision B9.4 as well.

In both of these cases, Seaboard makes essentially the same arguments as Merrill made in *Merrill & Ring*:

1. Force majeure. The basic language of the force majeure clauses in the Seaboard contracts is identical to that in *Cascade* and in *Merrill*, as are the historical facts regarding the fluctuation of the market price for timber. The plaintiff in the *Seaboard* cases says that it doesn't matter that it didn't request an extension for force majeure relief according to the timing and manner requirements laid out in the contract because the government would have denied its requests anyway. The court is skeptical of this argument. However, such questions need not be addressed, as Seaboard's force majeure argument fails for the same reasons as it failed in *Cascade* and *Merrill*.

2. The *Seaboard* plaintiff also attempts to invoke the defenses of commercial impracticability, impossibility of performance and frustration of purpose. As discussed *supra*, these defenses were unavailable as a matter of law to Cascade and Merrill, two plaintiff's similarly situated to the plaintiff in the *Seaboard* cases, in terms of relevant law and facts. The court thus rejects plaintiff's arguments here as well, for the same reasons they were rejected in *Cascade* and *Merrill*.

3. Also, Seaboard attempts to invoke the *Axman* defense, arguing that the terms of the resale contract differ materially from the original contract terms, and that the government is thus not entitled to recover contract damages from Seaboard. As in all of the cases previously discussed, there were changes in both of the *Seaboard* resale contracts. In *Seaboard*, No. 610–84, the period of performance in the resale contract was shorter than in the original, and appraisals for road maintenance and reforestation expenses were increased. However, there was no down payment or mid payment requirement in either contract, because both were concluded before such payments were statutorily required.

In *Seaboard*, No. 370–88, the resale differed in that there was a cash down payment and midpoint payment requirement in the resale contract which was not present in the original, reforestation and slash disposal expenses were higher in the resale contract, and the road deposit required increased as well. Also, the period of performance in the resale contract was decreased from nineteen to thirteen months. In *Seaboard*, No. 370–88, the second "What" contractor defaulted as well, and the contract was resold a third time. Plaintiff Seaboard feels that factors involved in this second resale should operate to further reduce any damages that it may owe, if it owes any damages at all. However, the extent to which any damages owed should be reduced due to this third resale is also a question of fact.

## CONCLUSION

### Capital Development

Plaintiff's *Axman* defense withstands the government's motion for summary judgment, in that it requires the court to look further into the particulars of the resale contracts before determining whether damages are due and if so, how to calculate those damages. The court finds, furthermore, that the government's sovereign act defense does not apply to these circumstances. Thus, on these grounds, defendant's motion for summary judgment is denied.

Plaintiff's argument that the C9.4 damages clause is void as a penalty must be rejected. C9.4 is the starting point for damages calculations, as contractually agreed, but a trial is required to determine whether damages should be reduced or eliminated. Fact questions also remain for trial as to whether the Forest Service first breached the Cow contract.

### Cascade Resources

As a general rule the terms of a contract control unless plaintiff can show by some defense that it has rights under the contract or by the law of contract that bar the government's damage claims. Plaintiff's defenses of force majeure, impossibility of performance, commercial impracticability, frustration of purpose, and the argument that the contract became illegal do not stand up against the contract terms. Thus, Cascade's motion for summary judgment must be denied. As in *Capital*, however, Cascade's *Axman* defense is adequate to withstand the government's motion for summary judgment.

A trial must be held to determine the applicability and calculation of damages.

### Merrill & Ring

Merrill, like Cascade, offers the defenses of force majeure, impossibility of performance, commercial impracticability, and frustration of purpose, although not illegality. For the same reasons as in *Capital* and *Cascade* the court must deny Merrill's motion for summary judgment. Here, as in *Capital* and *Cascade,* the *Axman* defense has sufficient merit to prevent the court from granting defendant's motion for summary judgment.

### Seaboard, Nos. 610–84C & 370–88C

As in *Capital, Cascade,* and *Merrill,* fact issues remain as to the materiality of the contract changes, so summary judgment is denied to both plaintiff and defendant in the *Seaboard* cases on this ground. Here, as above, trial is needed to determine whether the Seaboard resale contracts differed materially from the original contracts and whether, if not materially different under the *Axman* analysis, they were at least different enough to reduce damages owed to defendant.

THUS THE COURT ORDERS the parties, within 60 days, to file a joint or separate suggested trial schedule, after good faith efforts to develop a joint schedule. The court will schedule a status conference at that time or earlier if any party so desires.

In summary, both plaintiffs' and defendant's motions and cross motions for summary judgment in *Capital, Cascade, Merrill,* and *Seaboard* must be denied.

**IT IS SO ORDERED.**