**SEABOARD LUMBER CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

Nos. 370–88C, 610–84C.

United States Court of Federal Claims.

March 15, 2001.

William F. Lenihan, Seattle, Washington, for plaintiff.  Andrew R. Gala, of counsel.

Richard P. Nockett and John Warshawsky, with whom were Assistant Attorney General David W. Ogden, David M. Cohen, and John W. Showalter, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This action is part of a consolidated group of cases arising out of termination by the United States Forest Service ("Service" or "Forest Service") of timber sales contracts in the Northwest during the 1980's.  Seaboard Lumber Company ("Seaboard"), along with other companies, brought actions under the Contract Disputes Act[1] in an effort to have their non-performances of contract declared legally excused and to have the Service's claims reduced or set aside.  The government has counterclaimed.  Most issues raised in the complaint and counterclaim have been resolved in this action, as in others.[2]  Trial was conducted from October 16 through 19, 2000, in Seattle.

A single contract between Seaboard and the Forest Service is at issue: the "What" sale.  It involved timber on Forest Service managed lands in Washington state.  Seaboard's non-performance is conceded.  Pursuant to the contract, remaining timber was offered for resale.  The terms of the resale were not identical to the original sale.  Partly this is due to the fact that, at the time the contract at issue was re-offered, new regulations had changed the terms under which timber contracts legally could be entered.  The government has conceded that some of those changes had a material effect on the amount of the resale.

The primary issue addressed by the trial in Seaboard is whether the government lost or compromised its right to pursue a damage claim against Seaboard because the Forest Service resold the remaining timber on sub-

---

1. 41 U.S.C. §§ 601–613 (1994).

2. See Seaboard Lumber v. United States, 45 Fed. Cl. 404 (1999); Manke Lumber Co. v. United States, 45 Fed.Cl. 157 (1999); Seaboard Lumber v. United States, 44 Fed.Cl. 502 (1999); Manke Lumber v. United States, 44 Fed.Cl. 219 (1999); Seaboard Lumber v. United States, 44 Fed.Cl. 215 (1999); Seaboard Lumber Co. v. United States, 41 Fed.Cl. 401 (1998).  Early in this litigation, the Federal Circuit rejected plaintiffs' theory that the government's counterclaims could not be heard in this court.  Seaboard Lumber Co. v. United States, 903 F.2d 1560 (Fed.Cir.1990).

stantially different terms from those in the original contract. Post-trial briefing is complete. For the reasons which follow, the court concludes that defendant is entitled to recover on its counterclaim, as adjusted herein.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties have entered into a substantial stipulation in this case. In addition, the court's prior rulings provide much of the general factual and procedural background. Familiarity with those rulings is presumed. *See supra* note 2. The parties have also agreed that all testimony in the 1999 trial in a related case, *Capital Development Corp. v. United States,* Fed.Cl Ct. Nos. 610–84C and 750–87C (referred to herein as *"CDC"*), can be used in deciding this case.

*Timber Sales Generally*

The government relied primarily on two witnesses to explain the major components of the bidding process for Forest Service timber contracts. Jerry Hofer is currently head of sales, contracts and measurements for the Pacific Northwest Region of the Service, headquartered in Portland. The Pacific Northwest Region embraces the contracts at issue. He has served in the region previously as a Regional Forester Representative, acting on the Forester's behalf in determining whether timber sale administrators were performing as required. In addition, he has served as a contracting officer and is a certified appraiser. The second witness was Christine Anderson. She is currently both a contracting officer and Assistant for Timber Management Sales to the Regional Forester. Neither witness was directly involved in the termination of the contract at bar, or in the subsequent resales. Their evidence was directed at how the Region typically conducted its activities during the relevant period, and, based on their review of the records, what happened in these contracts.

From the standpoint of potential bidders, a timber sale commences when the Forest Service puts out a prospectus describing the timber site and the terms on which the contract is offered. Imbedded within the prospectus are numerous figures, calculations, and implicit decisions made internally by the Service. Also included within the prospectus is a minimum opening bid price, a figure that becomes important both in terms of the award and any subsequent resale attempt. The minimum bid price is the higher of the appraised rate (calculated by the Forest Service from cost data), the regulatory minimum rate for a given species, or the cost of essential reforestation, plus fifty cents per thousand board feet (mbf), known as the KV cost.[3] The contract may also provide "purchaser credits" which are intended to compensate the contractor for building roads on the site. As the roads are built, the contractor will receive a credit against the contract price above base rates it owes to the Forest Service. The amount of credit awarded per mile of road completed is set out in the contract. The prospectus also sets the length of time the contractor will be allowed to perform the contract and speaks to the timing of contractor payments for timber.

Interested parties are invited to bid based on the information provided in the prospectus and the bidders' own examination of the site. The terms laid out in the prospectus are not open to negotiation. Our predecessor court has held that Forest Service timber contracts are contracts of adhesion. *See Everett Plywood Corp. v. the United States,* 227 Ct.Cl. 415, 418, 651 F.2d 723 (1981).

*The "What" Sale*

The "What" sale was advertised on August 7, 1980. It is located in the Quilcene Ranger District of the Olympic National Forest in western Washington state. The sale cruise estimated 5,700 mbf of merchantable timber and an estimated 600 mbf of per acre materi-

---

**3.** KV refers to the Knutson–Vandenberg Act. A KV site plan provides for planting trees to replace those felled by the contractor. The Forest Service performs these tasks using funds set aside from the contractor's stumpage payments. If KV costs are more than the appraised cost or minimum rates, and the sale is then made for the minimum bid, the Service can be assured it will recoup reforestation costs, but it makes nothing beside. Jerry Hofer testified that such a sale may still be of benefit to the public in that there can be other reasons than making money to harvest timber, such as rejuvenating a forest or getting rid of infested trees.

al ("PAM"). There were eight units to be clearcut and one unit to be thinned. The total advertised value of the sale was $323,109. The sale called for construction of 1.86 miles of new roads and reconstruction of 1.74 miles of existing roads. The purchaser road credit could not exceed $370,501.

The agency conducted bidding on September 9, 1980. Seaboard's was the highest of four bids, at $925,828. In addition to the requirement to cut and pay for all timber at bid rates, Seaboard had to pay deposits for slash disposal ($24.56 per mbf) and road maintenance by the Forest Service ($3.79 per mbf). The contract length was 31 months, of which 18.5 months fell within the normal operating season of April 1 through November 30. Nine months of operating season fell after the required road completion date of November 1, 1981. The parties subsequently agreed to an extension to March 31, 1985 under the agency's SOFT II extension policy.[4] A second modification was agreed to in connection with litigation Seaboard and other timber companies had initiated. The contract eventually expired on December 28, 1985.

At the time the contract terminated, Seaboard had partially performed. It had constructed all of the specified roads and had harvested 323 mbf of timber from the road rights-of-way. Seaboard had not cut any other timber in the nine harvesting units, however. On January 15, 1986, the contracting officer notified Seaboard by letter that the contract had terminated uncompleted, and that the remaining timber would be resold in accordance with the terms of the contract.

The contract sets out at Provision B9.4, "Failure to Cut," the formula for calculation of damages triggered by Seaboard's failure to cut the timber:

> Damages due ... shall be the amount by which Current Contract Value[,] plus the cost of resale, less any effective Purchaser Credit remaining at the time of termination, exceeds the resale value at new Bid Rates. If there is no resale, damages shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and Effective Purchaser Credit.

In ruling on earlier motions for summary judgment in these consolidated cases, the court held that Paragraph C9.4, the successor paragraph to B9.4, is the starting point for damages calculations. *Seaboard,* 41 Fed. Cl. at 411–12. We rejected the timber companies' argument that C9.4 is unenforceable as a penalty. *Id.* We also held that plaintiffs' defense under *United States v. Axman,* 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198 (1914)— that the difference in resale terms bars a claim for breach damages—withstood the government's motion for summary judgment, in that it required the court to look further into the particulars of the resale contracts before determining whether damages are due and, if so, how to calculate those damages. The court also rejected the government's argument that, because the relevant differences were prompted by intervening regulations, the principle of "sovereign acts" precluded consideration of an *Axman* defense.[5] In these respects, Paragraph B9.4 is materially the same as C9.4, and the same results would obtain.

The damage calculation begins with the current contract value, which represents the unharvested timber left on the contracts. To determine that figure, the Service multiplies the then-current contract rate times the estimated volume remaining by species. The beginning point for calculating a credit for the timber remaining is a specified appraisal. The appraisal is done using "the standard Forest Service method in use at time of termination." If the contract is resold, however, the contractor is credited with the proceeds of the resale, rather than the appraisal. To the extent that the current contract value is more than either the resale proceeds or the appraisal, the contractor owes the difference.

4. Due to depressed timber prices, the Chief of the Forest Service adopted the SOFT I and SOFT II policies allowing extensions of up to two years.

5. *Seaboard,* 41 Fed.Cl. at 413–14, citing *United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

The Service appraised the uncut timber and advertised it for sale on April 3, 1987. The timber was not recruised. The resale assumed that 5,300 mbf of merchantable timber remained, along with 600 mbf of PAM. The total advertised value for the resale was $242,506. There were three bidders at the May 6, 1987 resale, one fewer than the original sale. Ben Levine was the successful bidder at $429,788. The second high bidder, Hoh River, came in at $429,688. The length of the resale contract was 14 months, of which 9.5 fell within the normal operating season. This first resale was named the What II Timber Sale.

Unlike the original contract, which required no down payment, the resale to Levine required a down payment of $61,800, calculated as ten percent of the advertised resale, plus twenty percent of the total bid premium. The cash could be released when 25 percent of the volume was cut and paid for. In addition, the resale required that the purchaser have paid at least 25 percent of the total contract value by the contract midpoint. In Levine's case, this amounted to $149,000.

Both of these contract differences, which will be referred to as the down payment and midpoint payment requirements, were prompted by new legislative and regulatory requirements.[6] On March 4, 1987, after the resale, David Unger, the Acting Associate Deputy Chief of the Service, issued a directive to contracting officers to make adjustments to the demand for damages to reflect the downward impact these changes may have had on bid prices, and set out a formula for doing so. The adjustments for down payment and midpoint payment made by the Service at that time were fundamentally a reflection of the time value of money using the current rate of simple interest prescribed

by the U.S. Dept. of Treasury (TFPM 6–8020.20) as published in the Federal Register.

There were also numerous other differences in the resale contract. The amount of the required slash disposal deposits, for example, increased from $24.56 to $26.26 per mbf and road maintenance increased from $3.79 to $4.35 per mbf. The bulk of the other changes were not argued by Seaboard as affecting the resale bids.

Levine ultimately did not complete the contract. He left portions of unit two uncut within the extended time for harvesting and the Service resold the remaining timber a second time, after auction, to Hermann Bros. That company did complete the harvesting, although it also cut substantially more than was advertised. The Service recovered over $80,000 from this resale (What III).

The Contracting Officer ("CO"), in a decision dated July 7, 1987, computed damages to be $911,833.90, based exclusively on the Levine resale. He made his calculation as follows:

| Current Contract Value of Remaining Volume | $861,329.31 |
| Plus Cost of Resale | 11,792.00 |
| Plus Ineffective Purchaser Credit | 468,500.00 |
| Less Resale Value | 429,787.41 |
| Total Damages | $911,833.90 |

There were no remaining purchaser credits, however, and defendant concedes that the CO erred in adding ineffective purchaser credits as a charge. It also points out, and Seaboard does not dispute, that the amount of current contract value was too low. In addition, the CO did not follow Unger's directive with respect to crediting the impact of the down payment and midpoint payment changes. These adjustments, explained at trial by Ms. Anderson, resulted in a reduced demand. Using the Unger memorandum of

---

**6.** In 1984, Congress enacted the Federal Timber Contract Payment Modification Act, 16 U.S.C. § 618 (1994), which directed, at subparagraph (d), that, effective in 1985, "in any contract for the sale of timber from the National Forests, the Secretary of Agriculture shall require a cash down payment at the time the contract is executed and periodic payments to be made over the remaining time of the contract." The Forest Service published rules implementing the act. 36 C.F.R. §§ 223.49–.50 (1986). Under the

rules, the midpoint payment, which amounted to twenty five percent of the purchase price, had to be paid by the midpoint of the contract. In this case, that meant that $149,000 had to be paid by November 30, 1987. This payment could be "earned" by harvesting and paying for stumpage. The down payment, on the other hand, had to be paid up front in cash or road purchaser credits, and was only returned or credited toward stumpage after twenty five percent of the timber was cut.

March 1987, she calculated the credits for down payment ($2,523.50) [7] and midpoint payment ($1,738.33). [8] At the time of the pretrial conference, therefore, defendant's demand had been adjusted as follows:

| | |
|---|---:|
| Current Contract Value of Remaining Volume | $875,649.70 |
| Plus Cost of Resale | 11,792.00 |
| Plus Ineffective Purchaser Credit | 0.00 |
| Less Resale Value | 429,787.41 |
| Less Down Payment Adjustment | 2,523.50 |
| Less Midpoint Payment Adjustment | 1,738.33 |
| Total Damages | $453,392.46 |

This amount was adjusted once again at trial based on the testimony of the government's expert witness Scott Olmstead, as will be explained. In addition to this principal amount, the government seeks prejudgment interest.

## DISCUSSION

■ Defendant's basic argument is as follows: the contract at issue expired uncompleted. Seaboard's failure to perform was a material breach, and therefore the Service was justified in reselling and demanding the resulting difference, calculated according to Paragraph B9.4. As will be discussed in more detail below, the question of who bears the burden of proof at various points is hotly contested. At the outset, however, the court concludes that the government, in asserting a counterclaim, bears the initial burden of demonstrating that it acted reasonably and in accordance with the procedures set out in the contract for calculating damages.

Seaboard presents a number of challenges to the counterclaim. One has to do with the direct costs charged by the agency for the resale. Seaboard claims that the amount, approximately $11,100, is too high. It also contends that the resale appraisal was not reflective of actual value, and that this skewed the resale bids.

Other challenges have a common thread—namely, that the agency altered the conditions of the resale to such an extent that resale cannot be deemed appropriate mitigation. Seaboard contends that the changes were so significant that they fundamentally altered the nature of the work and materially impacted the resale prices. The primary difference it points to is the imposition of the down payment requirement. Seaboard also contends that other differences—the midpoint payment requirement, decreasing the term of the resale contract, and increases in slash disposal deposits—affected the resale prices. Citing *Axman*, it urges the court to disallow the counterclaim completely because the differences fundamentally change the character of the work or cannot be quantified. Alternatively, it argues that the government has the burden of proving the dollar impact of these changes.

The government concedes that the resale in the case at bar differed from the original contract in several ways. Most of these differences, it contends, are either de minimis in effect or are the natural result of default, for example changes in quantity due to harvesting or price due to market fluctuation. The only changes that it agrees are subject to an *Axman* analysis are the new down payment and midpoint payment requirements, which it has attempted to quantify and remove.

■ The beginning point for unscrambling the legal effect of these changes is *United States v. Axman*, 234 U.S. 36, 34 S.Ct. 736. That case involved a contract between Axman and the federal government to dredge San Pablo Bay in California. The dredged material was to be deposited in one particular area, specified in the contract. Axman (due to equipment limitations) was unable to deposit the materials in the specified area in a timely fashion. The contractor requested permission to dump the materials in another location. The government refused the request, and Axman therefore could not perform the contract. The government then resold the contract. However, the resale contract expressly allowed the second contractor to deposit dredged material in the location where Axman had been refused per-

---

7. Based on the prevailing rates, Anderson used a seven percent simple interest rate, assuming that the entire down payment of $61,800 would be "on deposit" for half the contract length.

8. Unger's memorandum assumed that the midpoint payment, in this case $149,000, would be unrecouped for one eighth of the contract length.

mission to dump. The United States then sued Axman for the price difference between the original and the resale contracts. The Supreme Court held that when, after default of the original contractor, the government resells a contract, the original contractor cannot be required to pay the difference in price between the two contracts when "the work done under the second contract was not the work which the first contractor had agreed to perform." *Id.* at 45, 34 S.Ct. 736. Thus, where the government resells a contract to a second contractor on substantially different material terms, the government is precluded from recovering damages from the original contractor. *See American Surety Co. v. United States,* 317 F.2d 652 (8th Cir.1963).

*Axman* has been applied in this circuit. In *Schwartz v. United States,* 106 Ct.Cl. 225, 65 F.Supp. 391 (1946), a Navy office contracted with Schwartz to build an office communications system. Schwartz installed a loud speaker system, which proved to be inadequate. The Navy replaced Schwartz with a contractor who installed a somewhat different and more expensive telephone-based communications system and sued Schwartz for the difference in price. The Court of Claims, applying *Axman,* held that the second system was too different from the first system for the plaintiff to be responsible for the difference in contract price. The court stated that the government cannot recover from the original contractor when, "in the reletting there is a material or substantial departure from the original contract terms." *Id.* at 238 (citation omitted). If the reprocured contract is materially and significantly different from the original contract, then the government has, in effect, waived its right to seek reprocurement or resale damages.

The *Axman* line of analysis is not limited to an all or nothing approach. In *Doehler Metal Furniture Co. v. United States,* 149 F.2d 130 (2d Cir.1945), the Second Circuit incorporated a variation on *Axman.* The reprocurement contract differed from the original contract only in that the new contract had a liquidated damages clause, while the original contract did not. The court found that the mere addition of a liquidated damages clause was an insufficient change to defeat the government's claim for damages. It held that the effect of the liquidated damages clause on the price of the resale contract was a fact issue to be decided at trial, but that the change was not of sufficient magnitude to nullify altogether the government's damage claim under *Axman:* "Where the goods to be delivered under the two contracts are precisely the same and the only difference is an added item of obligation which enhances the cost in an ascertainable amount, the comparison, once the cost of that item is deducted from the price in the second contract, is unimpeachable." *Id.* at 134–35.

*Consolidated Airborne Systems, Inc. v. United States,* 172 Ct.Cl. 588, 348 F.2d 941 (1965), used the same approach. The court held that a change in the quantity of items affected the price of the resale contract, but that the change was not substantial enough to release plaintiff fully from paying damages. Instead, damages were merely decreased by the amount of the price variation due to the greater per item cost for producing a lesser quantity of the items.

*Eagle Aviation, Inc. v. United States,* 9 Cl.Ct. 128 (1985), involved reletting a Postal Service contract to transport mail by air. The original contract was for a specific period of time (25 ½ months) and the subsequent contract was for an indefinite term, not to exceed 180 days. The court held the original contractor liable to the Postal Service for the difference between the original and the new rate, as the two contracts were, "identical in all respects to those of plaintiff's terminated contract with two exceptions: the contract rate and duration of contract terms . . . ." *Id.* at 134. One of the factors which led the court to conclude that the higher rate charged in the follow-on contract was not due to the shortened term was that the second contractor had bid more on the original contract.

In *Mega Constr. Co. v. United States,* 29 Fed.Cl. 396 (1993), this court commented that, "Courts have often approved reprocurements on somewhat different terms than the defaulted contract. A reprocurement contract need not be identical to the original contract if excess costs can be calculated and if the contract is capable of a reasonable

adjustment ...." *Id.* at 484 (internal citations omitted.) The court allowed the original contractor some equitable adjustment in the damages he was required to pay when the price of the reprocurement contract was higher than that of the original contract. *Id.* at 491.

Finding a clear pattern in these decisions is not easy. But the lesson the court draws is that, if there are material variations attributable to the non-breaching party, there are three possible results. If the work is fundamentally different, i.e., if the substance of the work has been altered, then, under *Axman*, that party, in this case, the government, has presumptively waived the right to reprocurement (or resale) damages. The assumption is that, where the character of the work is fundamentally altered, no meaningful comparison can be made with the original contract. This principle only applies with respect to changes which the non-breaching party *elects* to make in the reprocurement contract. It would not apply to changes which are attributable to the private party's breach.

The second possible scenario is that the work is altered, but not in fundamental ways, i.e., the substance of the work is basically the same, but there is an allegation that there are changes impacting the reliability of a resale as a measure of damages. The effect of those changes should be quantified and eliminated. The third possibility is that such less-than-fundamental changes cannot be quantified, and, collectively, call into question the reliability of the resale or reprocurement as a measure of damages.

Who bears the burden of identifying material differences and quantifying their impact? Although neither *Axman* nor *Schwartz* discuss allocation of the burden of proof, we think it logically unfolds in this case as follows. The government has the burden of demonstrating that it reprocured or resold fundamentally the same goods in a reasonable manner. At that point, the burden shifts to the contractor to show that *Axman* or its progeny apply.

Admittedly, the Second Circuit *Doehler* case indicates that the burden of quantifying

the impact of changes rests with the government. *See* 149 F.2d at 135. The rule in this circuit is directly contrary, however. As held in *Consolidated Airborne Systems, Inc. v. United States,* 172 Ct.Cl. 588, 601, 348 F.2d 941 (1965), "the burden is on the plaintiff as the defaulting contractor to show not only that such a reduction in quantity caused unreasonable expense but also the amount by which the excess costs were increased by the unjustified expense."

*Miller v. United States,* 106 Ct.Cl. 239, 249 (1946), is to the same effect:

Under Article 15 of the contract the government had the right to terminate it for delays and to buy similar articles elsewhere and to charge the excess cost and liquidated damages to the plaintiff. This it has done, and the plaintiff is suing to recover these amounts because he says the Government was not put to these excess costs nor did it suffer liquidated damages.

He suggests that the articles purchased by the Government were not similar to those which plaintiff had contracted to furnish, and, therefore that proof that they cost more is not sufficient to show that the defendant was put to excess cost. If this is so, the burden is clearly on the plaintiff to show it. If he does not show it, he has not proven that excess costs were improperly deducted.

More recent decisions follow this allocation of the burden of proof. In *Engle Investors v. United States,* 21 Cl.Ct. 543 (1989), the very changes at issue in this case—increases in down payments and midpoint payments—were being challenged. The court held that: "Plaintiff's position is that since the Government asserted a counterclaim to recover the damages in question, the burden of proof on mitigation of damages must rest with it. Such is not the case." *Id.* at 552.

Plaintiff argues that the reference to mitigation in *Engle* distinguishes the case, but the court goes on to make it clear that it embraces within the broader rubric of "mitigation" the assertion that the government altered the nature of the work: "Further, plaintiff must also show that it was prejudiced in some way by the presence in the

[resale contract] of the changed conditions, *i.e.*, the higher down-payment requirement and the midpoint payment requirement." *Id.* Moreover, the court went on to hold that, even if the government bore the burden of going forward with evidence on the issue, "the Forest Service made an effort to mitigate by compensating for conditions which may have affected the purchase price of the [resale contract]." *Id.* at 552 n. 15. What the court refers to as mitigation is the effort at the administrative level to back out the impact of changes in the financial terms—the same thing the Service did here.

■ Although the issue has been confused by the government's concession of materiality and by its offer at trial to go forward with proof as to quantum, we conclude that the following is a correct statement of the law in this circuit. Once the government has put forward a prima facie case that it has contracted for fundamentally the same work or goods and has implemented in a reasonable way the contract-specified method of assigning damages, the contractor then has the burden of showing that changes to the resale contracts either require adjustment to damages in a specific amount, or cannot be quantified and are sufficiently significant that they dictate a rejection of the counterclaim altogether. The asserted deviation between the original and resale contracts becomes an affirmative defense, as to which the breaching party carries the burden of proof.

■ The beginning point for applying this analysis is to enquire whether, as in *Axman* itself, the changes substantially alter the *character* of the work. We find that they did not. The fundamental character of the work was the same—harvesting trees. There were no material changes in the way the work was to be performed. The only substantial physical difference, the lack of road construction, was not the fault of the government. As to changes in the financial terms, the court cannot ignore the reason these changes were imposed. They were required by regulations. Although the court has rejected this as a *per se* defense, it cannot overlook the fact that these changes were

legally adopted and binding on the agency. They are fundamentally different than the types of elective changes that were at issue in *Axman*, which went to the physical character of the work.

Finally, the Service implemented the terms of the contract in a reasonable fashion. It calculated what, on the face of contract, is a reasonable adjustment to the resale price based on the time value of money. This adjustment appears to be *de minimis*. A literal application of the *Axman* defense is therefore not available here—the work is not fundamentally different. The government has met its initial burden by reselling the same goods and calculating damages in accordance with the contractually-agreed formula. The burden of proof thus shifts to Seaboard to establish that the counterclaim should be adjusted due to the impact of material changes, or, alternatively, that the changes are material, cannot be measured, and it would be inappropriate to use the resale as a measure of damages.[9]

The government conceded that the changes to down payment and midpoint payment were material. They were designed, along with other changes to Forest Service timber contracts, to bring some realism to what was seen as speculative bidding. As the Associate Chief of the Forest Service, George Leonard, testified, however, the Service's primary motivation in the two financial changes was to create an incentive to earlier harvesting, not to suppress bidding per se. Irrespective of purpose, the government conceded that the precise amount of credit allowed by the CO and Christine Anderson on the resold contracts was insufficient. For that reason, it offered the testimony of Scott Olmstead, the business manager of Paneltech, LLC, a forest products company in Washington state. He has a bachelor's degree in accounting and has held accountancy positions with wood product companies his entire career. He has significant experience in assisting in pricing bids on federal timber. He testified in both the *CDC* and *Seaboard* trials.

9. Although the court has held in this opinion that the burden of proof at this stage is on the contractor, the issue was unresolved prior to trial, and the defendant put on evidence first.

Olmstead's analysis is predicated on adjustments to the resale contract. He concluded that it was impossible to project what the bids would have been at the time of original sale, but adjusted for the changed terms. Like David Unger, he attempted to back out of the resale price the impact of the fiscal changes, measured as the loss of the use of money advanced as down payments or midpoint payments. He began with the actual price of the resale contract, rather than attempting to make an adjustment to the original sale. This was prompted by his belief that the original bid and resale bids were not comparable due to an entirely different set of economics and market conditions and a different set of bidders. He then estimated the minimum prices the bidder expected to receive for end products at the time the products likely would have been marketed. Olmstead used that to project when a bidder would assume timber would be harvested and marketed. The point of the analysis is to estimate from the standpoint of potential bidders how long the down payments and midpoint payments would be "outstanding," i.e., not offset by income. His operating assumption is that those companies which showed up to bid at the resale would have been willing to pay more for the contract if there had not been a down payment or midpoint payment requirement.

In calculating the value of end product, Olmstead used two different forecasting methodologies. One is known as RISI, which stands for the name of the company which generates it, Resources Information Systems, Inc. The other is known as "Clear Vision." Both forecast forest product prices. They were the only forecasts known to Olmstead to be available at the time and they tracked the appropriate type of product for the timber sold. His own company's forecasts do not make use of either RISI or Clear Vision. Nor had Olmstead used either forecasting method in his own work. He only had indirect knowledge as to the use by other timber sale purchasers of RISI or Clear Vision in forecasting prices. He was unaware of the extent to which other purchasers made use of the services.

Although he had not used RISI or Clear Vision before, the projection of future prices was, however, something he had done in his prior work. When employed by Southwest Forest Industries he designed a method of projecting product prices and costs, data which was then used by the company in order to calculate maximum bids.

Using these two forecasting methods, Olmstead attempted to determine the ideal time for a contractor to market its product. From this, he projected when a contractor would want to harvest timber. Finally, he attempted to assess how long the down payment and midpoint payments would be un-recouped. He used a rate drawn from a weighted average cost of capital: a figure in excess of the applicable prime rate. This period of time and amount of money translated into a figure for the time value of money, a figure then used to adjust upward the actual bids. Unlike the Service's calculation, Olmstead's figure represents a figure compounded on a "365 day basis." Olmstead came up with a range of adjustments based on whether using RISI or Clear Vision yielded a higher or lower adjustment. During the *CDC* trial, he was unwilling to endorse either figure as "correct." Instead he sponsored the range as including the correct figure. The ranges were netted out against similar calculations done by the Forest Service in assessing damages. Olmstead's figures, overall, were higher than the amounts already allowed by the Service.

Olmstead did not attempt to determine whether the introduction of a down payment and midpoint payment affected the number of bidders who showed up at the resale. Indeed he believed that it would be impossible to make that determination. He did, however, disagree with the suggestion that the payment changes would affect bidders differently. His model takes that into account, he testified, by assuming that the difference in contract terms can be expressed in terms of the cost of money—something that would be universal in its effect. He did not agree with the suggestion that his figures are unrealistic in terms of credit available to smaller companies.

At the conclusion of the *CDC* trial, the court expressed its reservations about Olmstead's means of identifying the precise period of harvesting. He conceded uncertainties and deficiencies. The forecasting models he used have not been used for the purpose to which he put them; his own firm does not use them; and they yield different, sometimes very different, results. He has never undertaken a comparable study and knows of no company which uses the forecasting devices in the same manner. He could provide little more assurance of precision than to say that the two different tools ended up with two different results, and the answer was probably somewhere in the middle.

During the *Seaboard* trial, Olmstead attempted more comprehensively to explain why he used the RISI and Clear Vision methods of forecasting. "I used them [ ] because they are forecasting services as such. It's their job to forecast prices of lumber and other forest product items. And they had forecasts prepared at the time that was real information that was available at that time, and it was unbiased information [about] the appropriate items." Tr. 1056 Any other system, he explained would have to be based on actual data developed historically. In other words, it would represent hindsight, rather than what a bidder would have had available at the time. Using fundamentally the same model he used in *CDC,* he concluded that the correct offset for the cash down payment and the midpoint payment should be $17,608.

We can accept the underlying premise behind both the Service's internal adjustment and the one Olmstead applied, namely, that one way to measure the impact on resale bids is to estimate the cost of immobilizing capital during some portion of the contract period. The more readily ascertainable variables in that analysis are, obviously, the amount of the payments, the time period before they are recouped, and the cost of money. Olmstead fundamentally limited himself to these inquiries. His overall methodology, in other words, was like that of the Service. Where they deviated was in the amount of time the money was on deposit, not earning a return, and on the interest rate applied.

While the court is not persuaded as to the precise means Scott Olmstead offered in predicting when the harvesting would have taken place, this does not mean that the counterclaim fails altogether. First, because the court has the Service's own, more straightforward calculations before it. Second, our lack of confidence in Olmstead's forecasting model does not necessarily affect the rest of his analysis—that one means of estimating the financial impact of the changes is to measure the time value of money. The shortcomings, in other words, go only to the fine tuning of a relatively minor credit. The real question, then, is whether the overall impression left by the government's case—that whatever the financial impact of the new terms, it is small—is correct.

Seaboard's response to Scott Olmstead was left primarily to its own expert witness, Douglas Rideout, a professor of forest economics and management at Colorado State University. Professor Rideout also testified in *CDC.* Rideout received a Ph.D. in forest economics from the University of Washington. His particular expertise is in the economic interplay between public and private timber. He has completed a number of research projects involving financial aspects of the timber industry. One of particular relevance was a study commissioned by the Department of Agriculture in the late 1980's to evaluate the impact of the "Twelve Gifts of Christmas," a series of regulatory changes to Forest Service timber contracts imposed in the early 1980's, including the down payment and midpoint payment requirements at issue here. These changes occurred in stages, some of them implemented prior to the original contract at bar, and others afterward. His report was published in 1990.

Rideout explained that the purpose of the regulatory changes was to introduce more responsible bidding through imposition of new financially rigorous requirements. Indeed the preliminary comments to the 1983 regulatory changes requiring larger down payments indicate that those increases were appropriate to "stabilize bidding." The earlier imposition of a five percent down payment requirement had been thought necessary to

discourage "excessive bidding." 48 Fed.Reg. 48661–662 (Oct. 20, 1983).

The requirement on which Rideout focused in both the *CDC* and *Seaboard* trials was the increase in the amount of down payment, as he concluded that it had the greatest impact. He found "no significant effect on bids" for midpoint or annual payment changes. In *CDC*, the primary thrust of Rideout's testimony was his disagreement with Olmstead's assumption that the impact of the down payment requirement could be specifically measured. He suggested that the real impact of the down payment requirement is much more dramatic and illusive.

Rideout criticized many aspects of Olmstead's analysis; the main one being Olmstead's use of the bid price of the contract as the beginning point for a cost analysis. He felt that there are too many other variables in a potential bidder's own circumstances— whether, for example it could use purchaser credits, or whether it had other timber under contract—that would affect the bid price. In sum, he concluded in *CDC* that there is no model that can accurately calculate to the dollar the impact of changed conditions in a particular sale and resale situation. He also indicated that the T–Bill rate used by the Treasury is unrealistically low. Most borrowers would not be able to borrow at those rates.

This pessimistic view of the potentiality of calculating a credit was supported by another of Seaboard's expert witnesses, Paul Ehinger. Ehinger is currently a consultant in timber matters. He has an extensive background in northwestern timber sales, retiring as Senior Vice President of Edward Hines Lumber Company. Hines' operations primarily involved purchases from federal timber tracts, and hence Ehinger has a great deal of experience with bidding on Service contracts. He explained that down payment requirements will affect particular bidders differently. Smaller bidders, who may not be able to self-finance, would be particularly impacted. Moreover, the dynamics of bidding are affected if fewer entities bid. He believes that it is not possible to quantify this impact.

It should be noted, however, that plaintiff's witnesses did not completely reject the premise behind the Service's and Olmstead's approach. Rideout, for example, when asked if the "time value of money" approach to quantifying the cost to bidders had viability, said that it "has some viability. It is one cost." Tr. 877. He added that he did not "believe that it is the cost that the Forest Service had in mind when they introduced these terms in order to dampen speculative bidding . . . ." *Id.* Robert McLaughlin, Seaboard's former General Manager, testified that he later went to work for a different timber product company, MCMC, and was involved in bidding on contracts during the time of the What II resale. He testified that he did not take into account the midpoint payment, but did take into account the cash down payment. He concluded that it would increase the costs of acquiring and holding the sale. When asked how he factored the down payment into his bid, he calculated what "the money would cost me to borrow." Tr. 625.

Professor Rideout did two trial reports. The first, offered in the *CDC* trial, is dated April 22, 1999. It is not as detailed as his original analysis for the Service. Instead, it is a brief summary of the overall impact of all the "Twelve Gifts of Christmas" dating back to November 1981. He concludes that these changes,

> including reducing contract duration and volumes, fundamentally changed the nature of contracts. Contracts offered before the 12 gifts are not the same as contracts offered after, or as contracts that were resold. Post reform contracts are more complex, much more financially restrictive for purchasers, and are physically diminished in duration and volumes. Further complicating comparisons between pre and post reform contract effects are significant changes to the social and economic climate in which timber sale contracting has been conducted. Evolution in the economy includes changes in Federal Reserve policy, hyper-inflation followed by recession and then rapid economic growth, heightened environmental awareness with consequent declines in public timber offerings. Generally speaking, virtually any financial or physical requirement in the con-

tract that is restrictive on the purchaser can be expected to reduce bids.

Professor Rideout's studies, as well as Ehinger's related testimony thus make it clear that there were also other phenomena at work—unrelated to the twelve gifts of Christmas—that impacted the amount of the resale contracts.

In the *CDC* trial, Professor Rideout made the argument that the impact of the down payment addition was dramatic but unquantifiable. He took a different approach in the *Seaboard* trial prompted by the court's indication after the *CDC* trial that it was of the view that much larger economic forces than the down payment requirement appear to have impacted the resale contract prices. In his second, *Seaboard* expert report, he attempted to use the tables and conclusions of the 1990 report for the Service to isolate and quantify the dollar impact of the new down payment requirement.[10] His *Seaboard* testimony and report were not based in any particular way on the facts of the What II resale.[11]

The 1990 report offered conclusions about the relative effectiveness of various devices available to the Service to reduce speculative bidding, concluding that the one with the greatest potential effect was the down payment requirement. The report was based on a huge collection of data drawn from thousands of federal timber sales. "Portfolios" were constructed consisting of sales for individual bidders. The only data pulled from the sales were volume, length, and physical characteristics of the timber. Based on that portfolio, the report attempted to project the impact of various parameters in the contractor's bidding, such as down payment, length of term, and purchaser credits, by comparing it to bidding in the absence of that parameter or with different parameters. The model assumed the specific portfolio of contracts held by those bidders and that a sufficient number of bidders were present for the sale to be competitive. Each bidder was assumed to want to manage its existing portfolio in light of ideal harvest times. The model also assumed a ten percent cost of capital and an inflation factor of 20 percent per year. It assumed a minimum profit. Each sale thus was bid up to the maximum extent, leaving the minimum profit. The actual bid prices for the sales in the portfolios were irrelevant.

Because the original report was published in 1990, Professor Rideout understandably no longer had access to the underlying data. His *Seaboard* analysis thus was based strictly on the published graphs and conclusions. During cross examination, this meant he could not explain significant assumptions that went into the calculations or provide important details about how his model worked. He could not be exact, for example, about the years covered by the contracts sampled in his portfolios. Nor could an outsider precisely duplicate his work.

Professor Rideout concluded that the ten percent down payment requirement had the effect of depressing resale prices by at least 25 percent. He drew this conclusion from a bar graph included in his original report. The chart shows an index value of 0.745 for a portfolio with the ten percent down payment requirement, compared with a value of 1.00 without. The net import of his *Seaboard* testimony is that a contractor that would be willing to pay $1 million on a timber contract in 1987, absent the cash down payment requirement, would be willing to bid only $750,000 in the presence of the requirement. While the court understands that it is Professor Rideout's testimony that this is the objective result of his 1990 modeling, it is unfortunate that he was not better able to explain the mechanics, the—"black box"—of his analysis. On the face of it, it makes little intuitive sense that the true cost of a down payment which ultimately will be recovered is

10. According to Rideout, the only one of the twelve gifts materially affecting resale is the increase in down payment. The court will refer to it as the "ten percent down payment requirement" for shorthand. In fact it was ten percent of the bid price plus twenty percent of the overbid.

11. The 1990 report was not modeled on precisely the same down payment requirement as the resale contract. The resale contract released the down payment after the contractor harvested 25 percent of volume. Most of the computer runs in Rideout's model assume a down payment that persists through 25 percent of contract length.

more than the down payment itself. Particularly is that a puzzling result when he explained that his model assumes a competitive market, i.e., that the necessary number of bidders would be present. This, despite the fact that he rejected the government's carrying cost of capital approach because "[t]he key impacts are going to be beyond the carrying costs, and involve the number of bidders available ...." Tr. 933. This assumption in his model is fundamentally at odds with the suggestion that the effect of the down payment could exceed the carrying costs of the money tied up because of the leveraging effect of fewer bidders.[12]

Nor did Professor Rideout's model attempt to account for the effects of supply and demand. As he conceded, during a glut, as in the mid–1980's, fewer people are going to show up to bid. The model was not designed to generate data for a dropping market—the conditions in fact operating at the time of the resale. Instead it assumed a twenty percent annual inflation in the value of end product, conditions comparable to what caused the defaults in the first instance.

When asked to explain how a ten percent down payment requirement could be leveraged into a substantially larger percentage impact, he explained that the carrying costs for the down payments would prompt bidders to forego more profitable sales opportunities in the future. The cash down payment "can force earlier harvesting on other sales, which can be very costly to the purchaser, and also it can reduce the number of sales that a person can bid on." Tr. 864. This dynamic, however, was premised on bidders knowing that they were bidding into a steeply rising market. As he testified in *Seaboard*, "The model operates under the conditions that would be similar to what caused the defaulting in 1981," i.e., hyper-inflation in the timber market. Tr. 846–47. "The condition under which the model operated was an expectation of an increasing market for the value of the timber that's ... not under contract." Tr. 932. In fact, as he explained at the *CDC* trial, the point of the 1990 study

was to mimic conditions *before* the market collapse, but with the addition of the financial requirements later imposed. That was precisely not the situation at the time of the resale, however. The internal dynamic of his model, in other words, would not have operated at the time of the resale contracts.

The only other explanation Professor Rideout could offer as to how his model could result in an impact in excess of the time value of money was that the advisory committee and purchasers he had interviewed told him that. This explanation referred as well, however, to other factors, at least one of which could not be attributed to changes imposed by the Forest Service, namely a tightening of bonding requirements.

In response, during the Seaboard trial, the government offered the expert testimony of Randall R. Rucker, a professor in the Department of Agricultural Economics at Montana State University in Bozeman, to critique Professor Rideout's analysis. His area of specialization is natural resources economics. He has studied the economics of timber contracting extensively. His Ph.D. dissertation directly related to the subject matter of the litigation.

Professor Rucker, who presumably would have an easier time understanding Professor Rideout's 1990 study than did the court, prepared a report and testified that the study was either incomprehensible in places, or seriously flawed, or both. The court had an almost equally difficult time following some of Rucker's analysis, however, but his more basic criticisms of Rideout's model it could follow. One of his primary criticisms was that the study acknowledged the high degree of impact on bidding of length, volume, and the bonding requirement, yet they were excluded from the model. Professor Rucker criticized a number of apparent inconsistencies and errors, and, overall, concluded that it was inconceivable, given the real-world effect of more important factors like volume and term, that the cash down payment would have a twenty five percent impact on bids. He estimated that the impact would be less

---

12. As Robert McLaughlin testified however,
    Q. And would you also agree there was competitive bidding on the resale in 1987?

    A. Obviously, yes.
    Tr. 589.

than ten percent. He pointed, as well, to the apparent anomaly that the 1990 report showed the resulting impact in absolute dollar terms of $2.70 per mbf. Rideout conceded that this amount is not 25 percent of the actual price per mbf of timber at that point in time, which he estimated to be in excess of $100 per mbf.

The battle between the experts left the court with no real confidence in Professor Rideout's judgment that the impact of the financial changes was "at least twenty five percent." What the court does find from both Rideout's and Ehinger's testimony is that the Service's proposed credit, based strictly on the time value of money, probably understates to some extent the real impact of the financial changes, if for no other reason, because the interest rate applied is probably unrealistically low. In fact, the Service assumed in imposing the changes that they would have a more extensive, albeit unpredictable, sedative effect on bidding, something less than twenty five percent, but more than merely the time value of money. Before deciding the implications of this apparent stalemate for the government's counterclaim, the court must consider what else may account for the dramatic drop in prices.

*Other costs*

Thus far the court has been dealing only with the impact of the increase in down payment and the imposition of a midpoint payment requirement on the resale contracts. Plaintiff argues, however, that there are other changes which impact resale bidding, and particularly affected the unsold contracts. As outlined earlier, plaintiff argues that changes in KV costs, deposits, purchaser credit and local taxes are either the government's responsibility, or are so different from comparable original line items that they are facially unreasonable. The argument and evidence were not easy to follow.

Plaintiff's argument, as the court understands it, is that the increase in costs is unreasonable. For example, Paul Ehinger testified that the increase in KV costs in

some cases is inexplicable. This only takes the plaintiff so far, however. It still must show that, in the absence of the increase attributable solely to government mis-estimation, the Service would have received bids in excess of the amount of the lowest bid. The fact, therefore, that Scott Olmstead conceded that resale bidders would care about artificially high KV is insufficient as proof that the plaintiff was prejudiced.

To the extent plaintiff contends that the changes in KV costs and deposits were unreasonable, it has a difficult burden.[13] The court is persuaded based on Christine Anderson's testimony—evidence not really challenged by plaintiff—that the mere fact that there is a difference in the original contract and the resale offering in these respects is not surprising. The Service must calculate these amounts afresh in determining the minimum bids. Changes can arise due to the fact that the defaulting contractor may have harvested some of the timber. In addition, normal fluctuations in the cost of labor or equipment can explain a different figure. In either event, the government is not responsible for the change. Nor, in any event, is the defaulting contractor being directly charged with the increase.

With respect specifically to deposits for slash disposal work to be done by the Service, both contracts contained Special Provision 4.26. The original contract required the purchaser to pay slash deposits of $24.56 per mbf. The resale contract required slash deposits of $26.26 per mbf. Ms. Anderson explained that the Olympic National Forest had developed a computer-based appraisal system for estimating slash disposal costs. It was updated annually from actual cost data from the Service and from contractors.

In her testimony, Ms. Anderson went into some detail as to each component element of the slash deposit, explaining the differences in cost. It is unnecessary to examine them in detail. The Service went to some lengths to minimize the differences by scaling back on the type and quantity of work it required

13. The court rejects plaintiff's related argument that the government has to prove a loss. It is immaterial that the government may not have resold; that it later resold at a higher price; or

that if it ever resells it will be assured of recouping reforestation costs. The contract formula for assessing default damages in the event of no resale is enforceable.

of the resale contractor. By consciously minimizing the technical requirements, the Service ensured that the increase in slash deposits could only be attributed to increase in the costs of performing the work. That type of increase does implicate the *Axman* rule.

### Appraisals; Volume Estimates; Length of Resale

Seaboard questions the methodology involved in the original and resale appraisals. Seaboard also contends that the original and subsequent appraisals were based on completely inaccurate data about the volume of timber, and that this led to wholly unrealistic time constraints both in the original and resale contracts. Seaboard also makes the related argument that the failure to conduct accurate cruises resulted in unrealistically short contract durations on both the original and resale contracts.

With respect to the original contract, the challenge to the appraisal amounts to a claim of negligence—that the entire contract was flawed because of an unrealistically short time for harvesting what turned out to be approximately one third more timber than advertised. Given the fact that Seaboard did not cut the timber, it cannot claim to have run out of time despite best efforts. The argument is thus irrelevant. As to the resale contract, as explained below, the challenge is irrelevant for a different reason.

What is relevant in this regard is the difference in length of term between the original and resale contracts, because the two contracts involve what was represented to be the same amount of timber. Absent some reason to think that resale bidders knew that the quantities were wrong, in other words, the proper points of comparison in an *Ax-man* analysis are the volumes offered, not actual volumes.

Jerry Hofer explained that the practice in place in the region at the time of the original appraisal, as well as the re-appraisal after default, involved a calculation using the estimated value of the consumer end products implicit in the timber, plus profit, less the cost of production. Although the evidence put on by the government was indirect as to its compliance with standard appraisal practice in the resale,[14] the court concludes that, along with the testimony of Paul Ehinger, plaintiff's expert, it was enough to establish that the appraisal was conducted in accordance with the terms of the agreement.[15]

The court will assume that the plaintiff's factual premise is correct, i.e., that the methodology in place at the time of the resale did not generate a fair market value. Indeed, the methodology Hofer outlined was heavily criticized and has since been abandoned as not reflective of true fair market value. Plaintiff's argument fails, however, because its legal premise is incorrect. The Federal Circuit has held, in the specific context of this type of timber contract, that the parties' contracted-for means of measuring damages is enforceable. *Hoskins Lumber Co., Inc. v. United States*, 89 F.3d 816, 817 (Fed.Cir. 1996) (Hoskins "was emphatically not entitled to a 'fair' appraisal, an 'accurate' appraisal, a 'reasonable' appraisal, or any manner of appraisal other than the one indicated in section B9.4"); *see Madigan v. Hobin Lumber Company*, 986 F.2d 1401 (Fed.Cir. 1993). The contract here directs the Service to credit the defaulting contractor by using the then-standard appraisal method. That happened. The criticism that the method contracted for does not produce a fair market value figure is thus, according to the Federal Circuit, irrelevant.[16]

---

**14.** Hofer and Christine Anderson testified as to what standard practice was in the region; the appraisal summary forms in the record reflect application of the standard practice.

**15.** Ehinger was asked during the *CDC* trial whether "the appraisals involved in this case were prepared in accordance with the standard Forest Service method [in] use during the relevant period?" CDC Tr. 655. He responded that they were.

**16.** In *Madigan*, 986 F.2d 1401, the Federal Circuit reversed a United States Department of Agriculture Board of Contract Appeals decision, and held that the United States was entitled to contract damages as calculated under Provision B9.4 of a Forest Service timber contract, even though the Forest Service later decided not to resell the contract, but instead to preserve the area as a habitat for the northern spotted owl. In *Hoskins Lumber Co.*, 89 F.3d 816, the Federal Circuit reversed this court on the same question. In that opinion it addressed the fairness of the appraisal prescribed in Provision B9.4 more di-

The principal witnesses as to volume estimates were Christine Anderson and Richard A. Dinkelmann. Dinkelmann is the realty specialist for the Cowlitz Valley Ranger District in the Gifford Pinchot National Forest. During the time of the resale contract, he was a forestry technician in the Olympic National Forest, Quilcene Ranger District, beginning in 1976. His duties involved sale layout, cruising, putting together sale layouts, appraisals, timber cruises, contract drafting, construction, and logging feasibility analysis. He was involved in at least three dozen timber sales prior to 1988.

In the original What sale, Dinkelmann participated in cruising two of the units (one of which was dropped from the sale), and put together the sale layout, the logging feasibility report, the appraisal, and the contract. The sale ultimately consisted of nine units. He was the person who determined how long it was going to take to log the different units. Dinkelmann was not a certified cruiser, although his work was reviewed by more experienced supervisors.

The volume of timber relates to the contract term. The original contract length was 31 months, of which 18.5 fell within the normal operating season. Nine months of operating season fell after the required road completion date of November 1, 1981. The resale contract term, on the other hand, was 14 months, of which 9.5 fell within the normal operating season.[17] Plaintiff contends that the difference between What I and What II are substantial and had the effect of suppressing the value of the bidding.

In determining the duration of the contract, Dinkelmann used a Service worksheet which prompted him to consider such things as the volumes in particular units, the operating season, the production that would be experienced in different units using specific logging systems, and the amount of time that would be needed to complete roads. The district engineers, however, made a separate determination of the amount of time it would take to complete the required road construction or rehabilitation. In this case, they assigned November 1, 1981, as the time by which road work would have to be completed. Dinkelmann determined that it would take twelve months to do the logging. Eight of those months were scheduled for 1982. The others would be in 1981, overlapping the road construction period by one month.[18] He thus came up with a total of 31 months.

Dinkelmann was also involved in the What II resale contract. He put together the resale contract, the bid forms, and the materials used in the prospectuses. He first did a resale appraisal, using the residual value method, based on standard prices for end products. Because that figure was higher than the minimum stumpage rates or base rates, the advertised rates were based on the appraised values. A re-cruise was not performed because the Service assumed the original sale figures were correct, as modified for the small amounts taken out for the road right-of-ways.

In fact the actual volume of timber on the nine units was over eight million board feet, as opposed to the six million advertised,[19] as defendant concedes. The cutout on the second resale contract, "What II" was a total of 7.243 million board feet, including PAM. This was despite the fact that 90 acres remained uncut from unit two.[20] The original volume

---

rectly. Hoskins Lumber alleged that the Provision B9.4 damage calculation could not fairly be used, because the government, by choosing not to resell the contract but to instead protect the spotted owl, had not been damaged. In sum, strong precedent from this court and the Federal Circuit has held Provisions B9.4 and C9.4 to be valid ways of measuring damages, even in contracts in which there was no resale.

17. In addition, by contrast, there were two extensions granted on the What III sale, thereby giving a total of 14 months for the removal of the balance of unit two, versus 15 months for the original What II sale.

18. Dinkelmann testified that units five, six, and nine could have been logged before or during road construction began or was completed. Access, in other words, did not depend on completion of the road work.

19. The What III follow-on contractor ended up removing a total of 1,162,000 board feet, over thirty percent more than advertised.

20. Plaintiff finally makes the point that it was unfair to assess damages against Seaboard, when the first resale contractor, Levine, was not charged any damages. We disagree. The reason Levine did not pay damages is that an appraisal

estimate was 5.9 million board feet, including PAM. This may have been due to a serious error in calculating tree volume once diameter was determined. Apparently the formula used normally assumes a measurement taken at breast height. In fact the measurement was higher up the tree. The calculus used thus assumed a smaller tree.

Based on the same faulty information about volume, Dinkelmann calculated the term of the resale contract. He assumed a total of sixteen operating months on the original contract, and deducted six months for the road work, which was now unnecessary.[21] The resale also involved five percent less timber. Dinkelmann defended the decision to use ten months of operating season, less than the twelve months [22] originally allotted, in part because he assumed that some of the nine units could be timbered simultaneously. For example, unit nine could have been done while virtually any other unit was being harvested, as could units two and six. Dinkelmann assumed an eight hour work day. Bidders may have assumed the possibility of a longer work day. It is not uncommon for contractors to work longer than an eight-hour day or a five-day week. In addition, contractors could work outside the regular April–November season, unless the Service interposed an objection. Apparently others agreed, as three companies appeared to bid on the resale contract.

Christine Anderson also testified for the government. She is currently Assistant for Timber Management–Sale for the Olympic National Forest and is the contracting officer for the Olympic and the Mt. Baker–Snoqualamie National Forest. From 1981 to 1989, largely bracketing the time period at issue, she worked in the Olympic National Forest Supervisor's Office, as an operations forester, where she was involved in all aspects of timber operations including timber sale planning and preparation. She was not directly involved in the original contract, but was involved after termination in the preparation of the damage calculation and the contracting officer's decision. Her involvement with the resale was limited to review of the appraisal. She has extensive experience with appraisals and sales, however, and the court was impressed with her background knowledge of events connected with the default sales on this and related contracts, as well as practices and procedures of the Service. The government offered Ms. Anderson's testimony to compare the differences between the original and resale contract, and to explain the determination of damages. She performed a detailed analysis of the differences between the two contracts, including an assessment of the road maintenance and slash disposal plans plan for both the original and the resale contracts, and she evaluated the appraisal summaries.

Ms. Anderson endorsed Mr. Dinkelmann's work in preparing the contract for resale. She testified that his determination as to contract duration for both the original and resale contracts was consistent with district practice.

The court will assume that the original volume determinations were negligent, and, that if the Service had known how inaccurate the estimate was, it would have allowed additional time. But in terms of the reasonableness of the term of the resale contract, the court has no reason to think that bidders did not share the Service's ignorance of the real facts. The resale bids are based on the assumption of the advertised volumes. The resale bidders, in other words, were operating on the same assumptions as the Forest Service and the original bidders. As compared with the original bids, therefore, the resale bids were not unfairly depressed because of the faulty appraisals.

The real question is whether the reduced term impacted the amount of the resale bid-

---

of the remaining timber, compared to the contract price of the remaining timber, showed that it was worth more. The same thing could not be said at the time the Service calculated Seaboard's damages.

**21.** The original contract actually contemplated nearly twelve months of timber harvesting, but it

had been assumed that some of this would overlap with road construction.

**22.** A unit-by-unit calculation of the amount of time required in fact showed that 11.3 months were required for the resale, assuming no concurrence between units.

ding. The relevant comparison has to be with the original term less the six months of road work (twelve months), versus the ten months for the resale. The impact of the two month difference is minimized by certain factors: slightly less (400mbf) timber; the opportunity to double up on units; and the possibility of operating longer shifts, longer work weeks, and longer seasons. Those possibilities are clearly not illusory, as three entities made bids. There is substantial reason, however, to conclude that the length of the term of a contract has a material impact on what potential contractors are willing to bid.

Paul Ehinger did a study of the durations of contracts in the Olympic National Forest over the period of time covered by the litigation. He concluded that the length of the What II resale was substantially truncated by comparison with other contracts. The charts he developed draw distinctions between salvage contracts, which are generally shorter than green harvests, such as What and What II. Eliminating consideration of contracts with purchaser road credits (which would tend to call for more time), Ehinger's data and testimony supports his conclusion: "[F]or a sale that was not a salvage sale, the What II resale term was extremely short." Tr. 678. Professor Rideout also testified that the "shorter the contract, the less flexibility there is for the purchaser." Tr. 851.

Even though the work on the What and What II sales was, in his view, the same, Ehinger thought the difference in length of term suppressed bidding on the resale:

it limits the number of bidders because the removal is in a short period of time.... [If] he's an independent logger, only those loggers that have equipment available, and time, during that short period of time, can go and even consider undertaking the sale. And if you're a mill, you have to be able ... [to] use that 5 million-plus board feet in that period of time. What are my other contracts, and so forth? All the things are related. And it does definitely have a dampening effect on the number of people

who bid and how much they will bid.... The longer ... they have to work in the material, the longer they have to merchandise it, and the longer they have to adjust the schedule of harvest to their own schedule, the more they're willing to bid, the more flexibility they have .... You were in a compressed time period. [That] dampens the amount you're going to pay. Tr. 678–80.

The court finds that the decrease in contract term, although not improper, was also not immaterial. The original term was, relative to other contracts, already abbreviated. Decreasing it at all limited the attractiveness of the resale to that extent.

### Delay in Resale

One other concern raised by plaintiff about the resale was the sixteen month delay between termination and resale. As explained above, Dinkelmann testified that the original unit markers were not useable for the resale. All units had to be re-taped. In addition, the individual tree markings in both thinning units could not be used. Both units thus had to be repainted, a time consuming process, considering the density of the growth and the terrain. This process was delayed in part until the first available summer to make use of temporary employees. Given the amount of timber coming onto the market because of defaults during this period, the time naturally consumed in paperwork associated with preparing and noticing the resale, and the need for physically preparing the units, the court cannot find that the sixteen month period prior to resale was unreasonable. Nor, in any event, was there any proof of prejudice.

The court has considered the impact of other changes in the resale contract and concludes that they were immaterial.[23]

### The impact of market forces

The real difficulty the court has with Seaboard's position is that the overwhelming impression left by the evidence in the case is that other factors than the financial changes in the resale contract or the decrease in term

---

23. We reject, for example, Seaboard's contention that the imposition of Washington State excise taxes can be attributed to the United States.

had such an overwhelming impact on the timber market that the government's elective changes are dwarfed. Professor Rideout himself identified several other factors which significantly affected the timber market during the relevant time period, none of which can be laid to the government. The resale contracts, according to Rideout, were taking place in a context in which contracting for timber was "fundamentally" different.

It is noteworthy that Rideout's *CDC* report diagnoses four "contextual considerations" that led to the significant disparity between the prices for timber in the periods before and after the early 1980's. In the period including the What I sale, these "macroeconomic" factors consisted of: hyper-inflation; environmental constraints on forestry practices; lack of financial security requirements; and an expanding housing market. After 1982, the year Leonard characterized as the bottom of the market, the situation was reversed with respect to three of the factors: low inflation; new financial security requirements imposed by lenders or guarantors; and a contracting housing market. This latter period was characterized by a stumpage price decline of 40 to 50 percent. These factors, in short, made timber contracting in the mid–1980's fundamentally different from contracting in the 1970's and early 1980's. What Professor Rideout calls a "market crash" in 1981 lasted "two or three years," according to his 1990 report. Christine Anderson confirmed that between 1980, when What was initially sold, and 1987, the year of resale, the price of timber stumpage all over the Olympic Forest declined dramatically.

These considerations operated, as Rideout explained in the *Seaboard* trial, independently of the financial changes: "during the 1980's, there are oftentimes key changes to the economic environment under which the contracting takes place that would affect, say, prices, that might have nothing to do, or nothing directly to do with, some of these stipulations." Tr. 840. Indeed, it was the collapse and the subsequent defaults that prompted the imposition of new financial requirements in the period of the resale.

This observation is supported by a great deal of other evidence. Market conditions for timber at the time of the original sale were explained by Robert McLaughlin who is an expert on the Northwest market for timber:

Q. How did inflation affect your bidding in the '70s up to 1982?

A. . . . we were forced to add an inflation factor to our bids, [it] was the only way we could buy any timber. Otherwise, we'd have been—run out of timber. So we had to do this whether we wanted to or not.

Q. Was that because that was what your competitors were doing?

A. It was, evidently, because the bids reflected that.

Q. Okay. What about supply versus demand? . . .

A. Well, obviously the supply was less than the demand, because they would never have been bid that high if they—if there had been an oversupply.

Q. W[ere] the government and other sources telling you anything about the timber supply situation from Forest Service lands in the '80s?

A. Well, they were. There [were] . . . environmental considerations mainly. We saw that the sale[s] . . . were being reduced.

Q. Were they telling you anything about the demand for building materials in the '80s?

A. Well, at the—in the early '80s they were still very high, and then later on, why, we went into a time that everything almost quit.

Tr. 478–79. He testified that the prices for timber in the early 1980's were frequently three to five times appraised value. Thus the bidding that McLaughlin did for Seaboard up to the beginning of 1982 was influenced by a tight competitive market and the expectation of continued inflation.

Adding to the bidding dynamics prior to 1982 was the fact that it was possible to stockpile large amounts of timber at virtually no cost, in part because the "Twelve Gifts of Christmas" had not been adopted, but also because private bonding companies were so

lax in their requirements. The virtual absence of cost to acquire and hold contracts fed the bidding frenzy. Expectations of "improved market conditions in the future" also influenced the market. And there were concerns about shrinking supply.

Those conditions contrast sharply with the market during the resale period. As McLaughlin explained, the resale occurred after the economy had taken a serious downturn. Mortgage rates skyrocketed and home construction dropped off dramatically, affecting the value of standing timber. The result was that timber companies had obligations to pay for timber at rates that were far above the value that could be obtained for finished product, prompting an avalanche of defaults starting in 1982. McLaughlin conceded that in Seaboard's case, the decision not to harvest was a market decision by Seaboard brought about by the change in the economy. It was not prompted by physical problems. These conditions, of course, affected the price of all timber sold after 1985.

According to McLaughlin, in the period after the financial requirement changes, bidding reflected something closer to what timber companies felt was the current value of the timber, rather than its value at some time in the future. Bidding "reflected what the current value of ... the log was." Tr. 504. McLaughlin attributed these market changes at least in part to the changes in the Service's contracting terms: "the price of the Forest Service sales went down, because the cost to hold and operate those sales went up, so it was much higher after the 'twelve gifts' went into effect than it was before." McLaughlin testified that these changes "limited the bidder pool .... It removed some of the mills. It removed a lot of the logger/timber purchasers out of the ... timber sales," Tr. 488, and limited the size of the sales on which they could bid.

The complete reversal in the inflationary expectation resulted in collateral downward pressures, however, unrelated to the Service's actions. As McLaughlin candidly admitted, there was a complete turnaround in the bonding market. He explained first how easy it had been before the change in the timber market to obtain bonds:

Q. Were performance bonds readily available also?

A. Yes, they were.

Q. Were they very costly?

A. No. I don't know what the—can't recall right off what it was, but it was very, very minimal.

Q. And these—we're talking now about surety bonds?

A. Surety bonds, payment bonds.

Q. Would you have pre-authorized bonds available to you when—for use as a bid bond—

A. Yes.

Q. In the '70's and '80's?

A. Yes.

Tr. 480. After 1982, however, private bonding companies were requiring cash or its equivalent, instead of issuing bonds without security. As McLaughlin put it, issuing banks had his "assets tied up." Tr. 485.

Another factor putting a downward pressure on timber prices was the very fact of the prior defaults, a phenomenon that cannot be attributed to the Service. McLaughlin explained:

Q Were there also buy-out sales that were involved?

A Yes.

Q ... did that have an effect on the price bid for timber?

A Yeah, it would.

Q Focusing on 1985 onward, did they start dumping timber on the market? Would you indicate whether the volume of sales increased or not?

A I would say that it did, because they had the default sales that they had, that had come back.

Tr. 534–35.

Paul Ehinger confirmed that assessment: "the problem was ... the resales from the contract termination which was completed in '85, and the heavy salvage ..., all that served as a surge, and put a large volume of timber in the marketplace ... early in mid–1987, which, again, sort of saturated the market, which was limited, as it was. And as a result, you were not—you were not expected

to get the bids, and we didn't get the bids that you'd expected for the timber." Tr. 687–88.[24] As he concluded, "we ended up with the What II sale going on the market when the biggest amount of timber was put on the market in the Olympic National Forest." Tr. 688. Ehinger was asked what happens when you have a "glut of timber sales" being offered? He responded, "... when they got all they want, they're not going to buy. You're not going to get the money paid for it that you'd get otherwise." *Id.*

In short, while the record indicates that the addition of the down payment requirement (as opposed to other financial changes), and the slight decrease in term, drove down the resale price, perhaps in excess of the time value of money, the inescapable conclusion is that this impact was overwhelmed by much larger, totally unrelated market forces.

Can these causes be segregated in their effect? Certainly not with any precision. Professor Rideout pointed out that it is difficult to segregate the effects of the changed financial terms from the surrounding market conditions:

> .... with that kind of a change in the timber market, we would expect some ... reactions in terms of maybe price or other kinds of things that would be unrelated, say, to changing a cash down payment. If we have, for example, a financial term that's introduced at about the same time as something like this, then what we have in the measurement is a difficulty in sorting out which one actually caused the change in bids.

Tr. 841.

■ The complicating factor here, of course is that the *Axman* line of authority suggests that reprocurement or resale costs are not recoverable when the non-breaching party materially changes the resale terms in a way that cannot be measured. The court has found materiality and is satisfied that the degree of impact of government-caused changes cannot be measured with precision. Does that compel rejection of the counter-

claim? We think not. When a contractor, in bringing an affirmative claim, persuades the court that the government's breach caused damages, it is not fatal that precision is impossible. The court is permitted to fashion an estimate. *See Locke v. United States*, 151 Ct.Cl. 262, 267, 283 F.2d 521 (1960); *Servidone Const. Corp. v. United States*, 19 Cl.Ct. 346, 381 (1990); *cf. Ace–Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed.Cir.2000) (citing *Locke*, 151 Ct.Cl. 262). We conclude that the same principle should apply under the reverse circumstances, particularly when the burden of quantifying the changed terms is on the non-performing party and when the court is satisfied that the government changes are not primarily responsible for the price decrease. The question is whether there is some basis for assessing the degree of impact of the down payment requirement and the decreased term. We find that there is.

As between the change in down payment requirement and market forces, Professor Rideout testified that "the big ... drop here in prices that occurs in the middle of the '80s, ... can be related to increases in volume ... being offered and, possibly, the resale of volume put on the market simultaneously." Tr. 844. What Professor Rideout is confirming is the impression already drawn by the court from the other evidence, namely that the market impact on prices was much greater than the down payment requirement. Quantitatively, the largest impact by far thus has to be the drop in the timber market. The court also has some additional parameters to assist it. The impact of the down payment requirement is in excess of the time value of money, based on the testimony of Professor Rideout and Mr. Ehinger and on the uncontroverted expectations of the Forest Service in adopting the change. The court has Professor Rucker's testimony that the impact of the down payment, although more than strictly a function of interest, is probably less than ten percent of the bid price. The court has the testimony of Mr. Ehinger and Mr. McLaughlin that the short-

---

**24.** Eighteen million board feet was offered in 1985, 21 million in 1986, and in 1987, 37 mil-

lion.

er contract term has an impact, albeit unquantified, on what bidders are willing to pay for a contract.

We conclude that a fair and reasonable estimate of the impact of the down payment requirement is ten percent of bid price. We also estimate that the impact of the decrease in contract term is ten percent. The collective decrease in the government's counterclaim is thus $107,500.[25]

*Resale Costs*

Seaboard questions the cost of the resale, $11,791, a figure it considers to be unreasonably high. Dinkelmann explained that most of the balance of the expenses are associated with repainting and remarking, which was a labor intensive operation. New marking and painting were prompted by the eight-year lapse between the original sale and resale. Approximately half of that time was taken up by the original contract term, as extended. The balance is easily explained by the default process and the sheer volume of resales that the Service had to undertake. As to the amount of money spent on the resale, it took seven people 109 man-days to complete the task, a figure which plaintiff asserts is unreasonable. The court has no reason to question Dinkelmann's explanation, however, that the terrain and closeness of the growth caused the extended effort. We decline to adjust the claim for resale cost recovery.

*Interest*

■ Unlike Section C9.4, Section B9.4 does not provide for interest after resale. Nor is interest available under the Debt Collection Act, 31 U.S.C. § 3717 (1994), which only applies to claims arising on contracts executed before October 25, 1982. *Id.* § 3717(g)(2). The parties disagree, however, as to whether prejudgment interest is available to the government under common law principles. We think the government clearly has the better of the argument.

The Supreme Court in *Royal Indemnity Co. v. United States*, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941), held that the trial court could exercise its discretion in award-

ing an appropriate amount as interest for the non-payment of an amount found to be due. *Royal Indemnity* was a contract action on a surety bond, which amounted to an obligation to pay a fixed amount at a time certain. The Court held that, "[i]n the absence of an applicable federal statute, it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in terms of interest for non-payment of the amount found to be due." *Id.* at 296, 61 S.Ct. 995. The continued existence of this common law right to interest was more recently confirmed in *United States v. Texas*, 507 U.S. 529, 533, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993), also a contract action.

The plaintiff's argument that the amount here is not "liquidated" in the same sense as, for example, the amount due on a surety bond, is not telling.[26] The amounts claimed by the government in *United States v. Texas* or *West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987) were no more pre-determined than the recovery here. The relevant inquiry is whether there was a "contractual obligation to pay money." 479 U.S. at 310, 107 S.Ct. 702. Plainly there was. The contract set out a formula for calculating the amount in a way that, absent some defense, was objectively determinable under the contract formula. The fact that the amount has been reduced in litigation does not mean that it would be unfair to assess interest on the balance, or that the purpose of awarding interest—compensating the non-breaching party for the loss of the use of money—is not served. We hold that interest should be awarded to the government.

As the government concedes, the question of whether interest should be allowed and to what extent are matters within the court's reasoned discretion. We believe that an appropriate rate is that established by the Contract Disputes Act, a relatively conservative figure based on government securities. The accrual date is of concern to the court, however. The government proposes using the

---

**25.** The bid amount was approximately $430,000. This figure represents 80% of what the bid should have been, $537,500.

**26.** We agree with the defendant that the cases cited by Seaboard in this respect are distinguishable.

date of demand by the CO as the triggering event, making interest due from July 22, 1987. What that date does not take into account, however, is that Seaboard's contract has been bundled from the outset with more than a dozen other cases filed over twelve years ago. The lengthy procedural history of these cases need not be repeated here, and the government is correct that much of that history can be attributed to plaintiffs' litigation decisions. It is also true, however, that resolution of each individual case has been delayed merely by the fact that it has been consolidated with other cases. The government in particular has benefitted in terms of avoiding litigation expense by being able to argue in multiple cases the results of rulings in other cases. This process has, until recently, however, virtually assured that no single case could be resolved until the host of legal issues was addressed.

One other factor which mitigates against using a 1987 date can be considered. Although the court has held that neither the inaccuracy of the initial cruise nor the resale to Hermann Bros. bear on the damage calculation, we find it a relevant consideration that, if the initial cruise had been accurate, substantially more time would have to have been allowed from the outset for completing the harvest. That consideration is independent of the SOFT I and SOFT II industry-wide extensions. In light of these considerations, we fix January 1, 1994 as the date for the beginning of the running of interest.

### CONCLUSION

This action is withdrawn from consolidation with the related proceedings. Defendant has established its entitlement to recover on its counterclaim in the amount of $350,154.29, calculated as follows:

| | |
|---|---:|
| Current Contract Value of Remaining Volume | $875,649.70 |
| Plus Cost of Resale | 11,792.00 |
| Less Resale Value | 429,787.41 |
| Less Down Payment Adjustment | 53,750.00 |
| Less Contract Term Adjustment | 53,750.00 |
| Total Damages | $350,154.29 |

Defendant is entitled to interest on this amount, at the CDA rate, commencing as of January 1, 1994. Each side will bear its own costs. The Clerk is directed to enter judgment accordingly.